ANCHORS, SAILS, Etc., of The D'AL-BERTI, (DOMINY v.)

[See Dominy v. Anchors, Sails, Etc., of The D'Alberti, Case No. 3,977.]

═══════

# Case No. 348.

## The ANCON.

[6 Sawy. 118][1]

District Court, D. California. Nov. 22, 1879.[2]

COLLISION—LOOKOUT—CHANGING COURSE.

1. Steamer adjudged in fault for not keeping out of the way of a schooner seen to be ap-

[1][Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2][Affirmed by circuit court in The Ancon v. Thompson, 17 Fed. 742.]

proaching her nearly bows on, at the distance of a mile and a half.

2. The duty of unremitting attention on the part of a lookout enforced.

3. If the night was foggy, as claimed by the libellants, the steamer should have blown her whistle and moderated her speed, both of which precautions she neglected until too late.

4. If sufficiently clear to permit an approaching vessel to be seen at the distance of a mile and a half, her negligence in not keeping out of the way was inexcusable, if not unaccountable.

5. The familiar excuse set up by the steamer, that the schooner changed her course and ran across her bows, rejected as not supported by the testimony; and because, if it did occur, as stated by the steamer's second officer and lookout, the steamer had ample time to avoid the disaster.

[In admiralty. Decree for libellants. Affirmed in The Ancon v. Thompson, 17 Fed. 742.]

Milton Andros, for plaintiffs.
McAllister & Bergin, for claimants.

HOFFMAN, District Judge. At about a quarter before five o'clock on Saturday morning September 15, the schooner Phil Sheridan, bound on a voyage from this port to the Umpqua river, state of Oregon, was run into by the steamer Ancon, and received such injuries as caused her shortly afterwards to capsize and become a total loss.

At the time of the accident two persons were on the deck of the schooner—the helmsman, and a lookout forward. The schooner was sailing close hauled to the wind, and heading towards the land on a north-east half north course. Her speed is stated by those on board to have been from two to two and a half knots per hour. The claimants' witnesses, however, suppose that a four-knot breeze was blowing; but this opinion is the result of an estimate of its velocity founded on the course of the smoke issuing from the steamer's smoke-stack, a method of determining the rate at which a schooner, close hauled to the wind, was actually sailing, which seems quite unreliable. In the view I take of the case, the point is immaterial.

Upon taking the wheel at two o'clock A. M., the helmsman had been instructed by the mate to keep a good lookout for the land, towards which the vessel was heading. He was first apprised of the steamer's approach by hearing the noise of her wheels, and supposing it to be the sound of breakers on the beach, he gave his wheel a round turn, and, fixing it with a diamond screw with which it was provided, he ran forward to see if the shore was discernible. Almost immediately on reaching the forward part of the vessel, he discovered the steamer looming through the darkness some two or three hundred yards distant, and bearing down upon the port bows of the schooner. The men endeavored, by shouting, blowing the fog-horn, etc., to attract the attention of the steamer; and the helmsman, rushing aft, found the captain—who had been aroused by the noise

—at the wheel, with the helm hard-a-port. The collision occurred a few seconds afterwards, and was in fact inevitable from the moment the steamer was first discovered by the schooner.

It is not denied that the schooner was provided with lights, set and burning as required by law. It is also in proof that a fog-horn was blown at short intervals for about twenty or thirty minutes previous to the collision. The failure of the schooner not sooner to discover the steamer is accounted for by the circumstance that a dense fog prevailed, which rendered it impossible to do so. On this point the testimony is irreconcilably conflicting, not merely because the claimants' witnesses deny that a fog prevailed—although they admit that the night was very dark, that the sky was "clouded" and overcast, and that it was "smoky"—but because, if the second mate is to be credited, the schooner was first seen by him at a distance, he "can safely say," of one and a half or two miles. Her green light was also seen by Meihan, the watchman, as he says, at the distance of seven hundred yards.

The schooner was struck near her forward rigging on the port side, and, swinging around under the force of the blow, fell alongside of the steamer on her starboard side. No effort was spared to rescue her crew and passengers, and they were all, though with imminent peril to one of them, transferred to the steamer. The steamer lay near the schooner some three quarters of an hour or fifty minutes, when the master of the steamer, observing that the schooner had fallen over on her side, with her sails in the water, abandoned all hope of saving her and proceeded on his voyage.

The evidence in the case is very voluminous. Much of it, however, relates to matters comparatively immaterial, and much of it to matters so clearly established by proof as to obviate the necessity of a critical comparison and analysis.

The case may almost be determined on the testimony of one witness—Mr. Douglas, the second mate of the steamer, the officer of the deck at the time of the collision—and by applying to the facts, as stated by him, a few well-settled and familiar rules of law.

Mr. Douglas testifies that when he first saw the schooner he was standing about twenty feet from the stem of the steamer, forward of the standard compass. He had relieved and taken the place of the regular lookout, and given him permission to go below to get some coffee. He first saw the vessel, but not her lights, at the distance of one and a half or two miles. She then bore about one point, or a little better, on his starboard bow; two or three minutes later he saw the schooner's green or starboard lights. He then gave orders to the quartermaster to starboard the helm, and the vessel went off about two points towards the shore. This

he verified by the compass, but "thought," he says, "that the course of the vessel was not altered quite fast enough." He does not appear, however, to have acted on that impression by repeating his order to the helmsman. At the time this change in the steamer's course was made, the schooner was distant about a mile.

The account given by Mr. Douglas of the succeeding occurrences is obscure and inconsistent.

On his direct examination he states that, after changing his course two points, as above described, he "thought he instantly saw two lights." He "then walked aft, about 'ten feet beyond the pilot-house, and notified the quartermaster that he had lost the appearance of the lights—to look out.' He answered me, 'Yes, sir.'" "I then walked forward to the compass and looked at the compass again, and looked out for them again, and I saw they were coming very near, and I then ordered him to stop; seeing the red light, the flame, I ordered him to stop her; I then ordered him to blow the whistle, and he blew the whistle; I then ordered him to put his helm hard-a-starboard; I ordered him to blow the whistle to alarm the people, for I knew there would be a collision then."

On his cross-examination, in reply to an inquiry, how long after he saw the green light both lights came in view, he says: "That was instantaneous—probably two or three minutes after. It was so instantaneous that it confused me. That was when I ordered the quartermaster to look out—that he was changing his course."

The schooner was then, he says, probably half a mile or three quarters of a mile off. The two lights were in sight about half a minute. He then went aft to warn the quartermaster, and on his return only the red light was visible. The schooner was then "close aboard; probably two hundred and fifty yards off." It was then that he gave orders to stop and to put the helm hard-a-starboard. The helm up to this moment had remained as he had first ordered, viz., two or three spokes to starboard. In a subsequent part of his deposition the witness admits that, when he gave the order to stop, the schooner was within two hundred and fifty feet of the steamer. He also states that the collision occurred almost instantly on his return from the pilot-house, and that the time during which the schooner was not under his observation was about three minutes. He subsequently says, that on reflection he is inclined to think he has overestimated this interval.

The above is the substance of Mr. Douglas' testimony, expressed in his own language. Assuming his account to be in all respects accurate, there can be no doubt that the steamer was in fault. A vessel is descried at a distance of one and a half or two miles; she is run down by a steamer which had, by

stopping, backing, or changing her helm, absolute control of her movements.

It is apparent from Mr. Douglas' narrative that, with the exception of starboarding the helm two spokes, nothing was done by the steamer to warn the approaching vessel, or to avert the disaster. The testimony clearly shows that the blowing of the steamer's whistle, the stopping of the vessel, and the putting of the helm hard-a-starboard, all took place too late to be of service, and when the collision was inevitable. When the lookout was permitted to go below, he was not relieved by another of the crew. The officer of the deck undertook to act as his substitute. So negligently did he perform his self-imposed duties, or rather so negligently did he attempt to discharge the duties of lookout and of officer of the deck at the same time, that he deserts his post, goes to the pilot-house, and only regains his station (after an absence of, as at first stated by him, three minutes) at the moment of the collision. At the speed at which the vessels were approaching each other, more than half a mile of the interval between them would be traversed in that time.

The absence of a competent lookout is of itself a circumstance strongly condemnatory, and clear and satisfactory proof will be exacted that the misfortune encountered was not attributable to her misconduct in that particular. The Alabama and The Gamecock, [Case No. 122;] The Armstrong, [Id. 540;] The Batavier, 9 Moore, P. C. 300, 301; The Blossom, [Case No. 1,564;] The Colorado, 91 U. S. 694–699; The Europa, 2 Eng. Law & Eq. 563, 564; The Farragut, 10 Wall. [77 U. S.] 337; The Genesee Chief, 12 How. [53 U. S.] 462, 463; The Iona, 2 Mar. Law Cas. 133; The Java [Case No. 7,233;] Killam v. The Eri, [Id. 7,765;] The Londonderry, 4 Notes of Cas. Supp. 41–46; The Northern Indiana, [Case No. 10,320;] The Sea Gull. 23 Wall. [90 U. S.] 174–177; The New Orleans, [Case No. 10,179;] Ward v. The Ogdensburg, [Id. 17, 158.]

Nor will the captain or officer of the deck be accepted as competent lookouts. Chamberlain v. Ward, 21 How. [62 U. S.] 570; The Comet, [Case No. 3,051;] The Northern Indiana, [Id. 10,320;] The Ottawa, 3 Wall. [70 U. S.] 273. Nor the pilot and helmsman. The Alabama and Gamecock, [Case No. 122;] The Genesee Chief, 12 How. [53 U. S.] 463; The Ottawa, 3 Wall. [70 U. S.] 273; Rusk v. The Freestone, [Case No. 12,143;] Western Ins. Co. v. Goody Friends, [Id. 17,436.] Nor the steward and passengers. The Gratitude, [Id. 5,704;] McGrew v. The Melnotte, [Id. 8,812;] Amoskeag Co. v. The J. Adams, [Id. 338.]

The want of a lookout is not excusable because all hands are called to haul in a damaged mainsail, or to reef sails, or to haul down the flying jib, or to stow the anchor or by a custom for all the ship's company to stand lookout the first day of the

voyage. Whitridge v. Dill, 23 How. [64 U. S.] 453; The Catharine v. Dickinson, 17 How. [58 U. S.] 177; Thorp v. Hammond, 12 Wall. [79 U. S.] 414; The H. P. Baldwin, [Case No. 6,812;] The Lady Franklin, [Id. 7,984;] Sturges v. The Mazeppa, [Id. 11,271.]

The authorities I have cited sufficiently illustrate the inflexible rigor with which the rule which requires a competent lookout to be stationed, and that he be vigilant and unremitting in the discharge of his duty, is enforced.

"When strong evidence in a case of collision tends to show that the catastrophe was owing to the failure of the lookout of the libeled vessel to attend to his duty, every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated, until she vindicates herself by testimony conclusive to the contrary." The Ariadne, 13 Wall. [80 U. S.] 475.

The proof in the case at bar brings it fully within the principles thus laid down by the supreme court. But it is not merely that the second mate dismissed the lookout and assumed the discharge of his duties, and that he left his post and was absent during several critical minutes, while there was yet time to avert the disaster, but, by his own showing, he sees a vessel approaching nearly bows on, at the distance of one and a half or two miles; he sees her, as he says, change her course at the distance of one half or three fourths of a mile, and yet, up to the moment of the collision, takes none of the precautions, such as stopping, slowing, blowing his whistle, etc., enjoined by law and dictated by common prudence.

On the contrary, the starboarding (which might have been proper if, as he says, he first saw her green light) is persisted in after the red light became visible, and when there was ample room, by porting his helm, to pass under the stern or on the port side of the schooner, or by stopping and backing to have avoided all possibility of disaster.

The steamer being thus found to be clearly in fault, it remains to consider whether the schooner, by any fault on her part, contributed to the disaster. It is intimated, though not directly charged, by Mr. Douglas, that the cause of the accident was the change by the schooner of her course, so that she ran directly across the bows of the steamer.

This defense is characterized by Mr. J. Grier as "a stereotyped excuse, usually resorted to for the purpose of justifying a careless collision; it is always improbable, and generally false." [Haney v. Baltimore Steam Packet Co..] 23 How. [64 U. S.] 291.

The only evidence tending to show that the schooner made the change in her course imputed to her, is the statement of Mr. Douglas, that he first saw her green light alone. To accept this statement, we must disbelieve the evidence of those on board the schooner; we must also reject the inferences which may naturally and safely be drawn from facts which are not fairly open to dispute.

The schooner was beating up the coast against a north north-west wind. She was close hauled to the wind on her port tack. The steamer was coming down the coast, heading nearly south. If, as the second mate testifies, she was one point on his starboard bow, the green light would probably not be visible to him—certainly not her green light alone. There is not the slightest reason to suppose that she went about and was put on the other tack. Her helmsman and lookout both testify that she was standing towards the land. The latter had been cautioned by the mate to look out for the shore, and the noise of the steamer's paddles was at first mistaken by both of them for the sound of breakers on the beach. This circumstance, which it is impossible to suppose they have invented, appears conclusively to show that they were in fact on the port tack, heading in shore, and that the vessel had not gone about so as to present her green or starboard light to the approaching steamer. No necessity or convenience of navigation is suggested which could have induced the schooner, when sailing on the wind, to luff up so as to expose her green light alone to a vessel approaching her from an opposite direction; and I see no reason for discrediting, on the faith of Mr. Douglas' unsupported statement, the positive testimony of those on board of her

With regard to the weather, the testimony is, as has been observed, conflicting. All agree that the night was cloudy and dark. The claimants' witnesses deny that it was foggy. Two circumstances, however, lead me to the conclusion that in this they are mistaken:

1. The fact, which is uncontradicted, that some time before the accident, the fog-horn was passed by the man at the wheel of the schooner to the lookout, and was blown at short intervals up to the moment of the collision. That at the time of the collision it was sounded and heard on board the steamer is not denied. The weather, therefore, must have been such as to suggest to the crew of the schooner the propriety of its use.

2. A fog did in fact set in after the collision. It was of short duration; but the line which led from the steam whistle forward to the lookout station, was adjusted, and the whistle was sounded some half a dozen times, a short time after the collision.

This, though it does not prove, makes it probable that similar weather prevailed before the collision. The supposition, that owing to the fog the second mate of the steamer failed to observe the schooner until she was close aboard of her, is the more natural, and indeed more charitable, explanation of the occurrence, for it relieves Mr. Douglas of the imputation of gross and almost unac-

countable negligence, to which otherwise he would be obnoxious. It does not, however, acquit the steamer; for it was her plain duty to moderate her speed and to blow her steam whistle, both of which precautions she utterly neglected. A decree will be entered in favor of the libellants, and an order of reference to take proofs as to the damage.