## THE ANCON v. THOMPSON and others.

*(Circuit Court, D. California.   October 16, 1882.)*

1. COLLISION.
   Where a steamer and schooner came into collision, the schooner having been seen approaching a mile and a half distant, the steamer was *held* to be in fault and liable.

2. FOG OR HAZE AND SMOKE.
   The night being foggy or hazy, or both, it was the duty of the steamer to moderate her speed and blow her whistle.

3. INEXCUSABLE NEGLIGENCE.
   If the schooner was seen from the steamer at a distance of a mile and a half, the negligence on the steamer in not keeping out of the way was inexcusable.

4. FOG.
   In the condition of the atmosphere in this case there was no fault in the schooner in not discovering the steamer at an earlier period[1] of time.

5. NO FAULT IN SCHOONER.
   Under the circumstances in this case, it was not a fault in the schooner to put her helm hard a-port at the time she did, nor was she in fault in other respects

### FINDINGS OF FACTS.

1. On the morning of September 15, 1878, the side-wheel steamship Ancon, on a voyage from Portland, Oregon, to San Francisco, California, came in collision with the schooner Phil. Sheridan, whereby the latter was wholly lost. The collision occurred between 20 minutes and 15 minutes before 5 o'clock in the morning of that day

---

[1] From 8th Sawyer.

2. The collision occurred in the Pacific ocean, at a point therein to the northward and westward of the entrance to the Umpqua river, from six to seven miles distant from the shore at the mouth of said river.

3. The speed of the steam-ship at the time of the collision was, and for some hours before had been, by steam, about eight miles per hour; and, in addition, it had the advantage of a current in its favor of one mile or one and a half miles per hour. From 4 o'clock A. M. till the lookout of the steamer saw the schooner, and first ordered a change of the helm shortly before the collision, the course of the steam-ship had been due south.

4. On the fourteenth day of September, A. D. 1878, and up to 6 o'clock in the afternoon of that day, the schooner had been, and was, lying at anchor a short distance from land, the Umpqua river bearing north-east, about two miles distant. She was at that time bound from San Francisco to said river.

5. At 6 o'clock in the afternoon of the fourteenth day of September, A. D. 1878, the schooner got under way, and with the wind N. N. W., stood off shore, close-hauled, on the starboard tack, and continued on this course till 12 o'clock midnight.

6. At 12 o'clock midnight the schooner changed her course, went about on the port tack and close-hauled, with the wind still N. N. W., occasionally varying from a point to a point and a half, stood in towards the land on a course N. E. by N.

7. At 12 o'clock midnight, and up to the time of the collision, the speed of the schooner was and had been from two to three miles per hour—not exceeding three miles.

8. The schooner from 12 o'clock midnight, and up to the time of the collision, had all the lights required by law properly set and brightly burning.

9. The schooner, from 12 o'clock midnight, and up to the time of the collision, had a lookout, properly stationed and attentive to his duties as such.

10. From 4 o'clock A. M. till the collision, the wind, with slight variations from time to time, was W. N. W., and the schooner, up to a point of time immediately before the collision, where the change in the helm hereinafter stated occurred, was sailing by the wind on a course N. E. $\frac{1}{2}$ N.

11. From and after 10 minutes past 4 o'clock A. M. of September 15, 1878, up to the time of the collision, a fog prevailed in the track of the schooner of such density as to obstruct the view and largely tend to prevent the steam-ship and its lights from being seen from the schooner, and a fog-horn was sounded on the schooner at regular intervals of not more than five minutes.

12. At about 20 minutes before 5 A. M. the man at the wheel on the schooner heard the sound of the paddle-wheels of the approaching steam-ship, and thought it was the sound of the surf breaking on

the shore. His orders had been to keep a good lookout for the shore. He thereupon gave his wheel one turn to port, and fixed it in that position by means of a diamond screw, the object being to enable him to go off quickly in case he should prove to be near shore, and then ran forward to where the man on the lookout stood to ascertain whether his supposition was correct. The sound at about the same time attracted the attention of the lookout, who also thought it was the breaking of the surf, and both were looking to see if breakers were near, when immediately the loom of the approaching steamer appeared close upon them, on the port bow, not more than three ships' lengths distant, coming head on. This was the first known of the approaching steamer on board the schooner. The loom of the steamer first appeared, and afterwards the light at the masthead was seen. The man on the lookout immediately commenced hallooing to attract the attention of those on the steamer, and he heard the order on the steamer to put the helm hard a-starboard; the helmsman at the same time seized the fog-horn, gave a blast upon it, and then hastened back towards the wheel, where he saw the captain already at the wheel. The captain, being in his cabin and hearing the hallooing and the fog-horn, rushed on deck, and, seeing the steamer close on him, seized the helm and put it hard a-port; and very soon thereafter the steamer struck the schooner on the port side just before the rigging.

13. It was the captain's watch on the schooner from 4 o'clock A. M., and he was called at that hour. Upon looking out, and finding the sea not rough, he lighted his pipe and sat half dressed smoking in his cabin, near the steps, close by the wheel, till he heard the noise upon deck made by the lookout and helmsman, when he rushed out and put the helm hard a-port, as stated in finding 12.

14. There was no officer on the deck of the schooner during the half hour preceding the collision other than the man at the wheel, who was competent for the position, the cook, and the man on the lookout; but the latter was a competent lookout, and was at his proper post during all that time.

15. There was a torch on the deck of the schooner, but it was not lighted or shown in the manner required by the act of congress; and there was no time to light or show the torch after the discovery on board the schooner of the approaching steamer and before the collision. Had a lighted torch been exhibited after a discovery of the steamer it could not have prevented, or contributed to prevent, the collision. The schooner and its lights had been seen by, and its position was known to, the officer in charge of the steamer, as is shown by claimant's testimony, several minutes before the steamer had been discovered by those on and in charge of the schooner.

16. The general facts, as stated in findings 12, 13, 14, and 15, are clearly and satisfactorily shown by the testimony of the libelants, to which there is no contradictory evidence, except as to the

prevalence of fog and certain inferential evidence upon the question as to whether the schooner changed her course at an earlier point of time than that indicated in these findings, and upon the question of the fogginess of the weather. I think the greater weight of evidence goes to establish the existence of considerable fog. The testimony for the claimant is that the sky was overcast and the atmosphere thick, smoky from fires in the mountains, and hazy without fog, and that a vessel could be seen two or three miles. I think from all the evidence that there was considerable fog along the path of the schooner just prior to and at the collision. The steamer itself encountered fog and blew its whistle for some minutes soon after. It was either smoky and hazy, or foggy, or both; probably in some degree both. I am also satisfied that the finding states the facts as to the maneuvering of the helm of the schooner prior to and down to the collision.

17. The steam-ship, from 4 o'clock A. M., had all her proper lights set, lit, and burning, and at and previous to the collision, also, had her second officer, Douglas, a man of long experience at sea, on deck, and a competent man at the wheel.

18. The testimony of Douglas, the second officer of the ship, and the officer of the deck, at the time of the collision, given on behalf of the claimant, is to the following effect: At about half-past 4 o'clock A. M., a short time before the collision, the special lookout of the steamer left the deck, with the permission of Douglas, the officer of the deck, to get a cup of coffee, and thereupon the officer of the deck acted as lookout for the steamer, and in so doing stood on the hurricane or upper deck of the steamer and in the most forward part of said deck, and in a position where his view was unobstructed, and while said officer of the deck was thus on the lookout he saw the schooner in question some eight minutes before the collision, and at the distance of a mile and a half the schooner being first seen; but very soon after showing her green light only, something more than a point off the starboard bow of the steamer. As soon as the schooner was seen by the officer of the deck on the steamer, he ordered the man at the wheel of the steamer to starboard his helm, which order was instantly obeyed by the man at the wheel, and thereby the course of the steamer was changed two points more to the port side, or shoreward. When the green light came into view the schooner was about a mile distant. Very soon after the green light appeared both lights came into view, "so instantaneous" that it "confused" the officer, the schooner being then about three-quarters of a mile distant. The two lights were in sight but an instant, not more than half a minute, when the green light disappeared.

Immediately after seeing the two lights Douglas walked aft to a point about 10 feet behind the pilot-house, notified the quartermaster at the wheel that he must look out, as he had lost the lights, then walked forward and looked at the compass; then looked out for

the schooner again, and saw her coming very near, and seeing the red light only, ordered the helmsman to stop the ship, to blow the whistle in order to alarm the passengers, and to put his helm .hard a-starboard, all of which was immediately done. When he thus saw the red light the schooner was off the steamer's starboard bow and about 250 yards distant, and he at once gave the order to stop her. The schooner was under the observation of Douglas with lights and no lights about eight minutes; and during this period after he saw the green light there was a period of about three minutes, probably less, during which she was not under his observation at all. It was the period when he went aft to give orders to the man at the wheel. The schooner, as stated by Douglas, when her green light was first discovered, was running on a line parallel with the course of the steamer, one point to the starboard of the steamer, and had the courses of the two vessels thus continued they would have passed with a space of about a quarter of a mile between them, while the change of the steamer's course two points further to port by star-boarding her helm would have carried them all of a mile apart when they passed.

Another witness who was below at the starboard port says he heard the order to starboard the helm given by the officer on deck, and looking out of the port saw a green light. He went on deck and there saw a red light. He judges it was four or five minutes after he thus saw the green light before the collision. The man at the wheel of the steamer, notwithstanding the order given him, did not see the schooner, or either of her lights, till she came close along-side, after the order to stop was given. This is the substance of the testimony given on the part of the claimant.

19. If I am wrong in the twelfth, thirteenth, fourteenth and fif-teenth findings, then the facts as testified to and stated in the eight-eenth finding, present the case on those points in the strongest light for the claimant and appellant.

20. The steamer being heavily loaded and running at a speed of eight miles per hour could not be stopped and backed within a less distance than one-half a mile.

21. No order was given to stop and reverse the engine of said steamer, nor was the same stopped and reversed, nor was the speed of the steamer slackened at any time till about one minute or less be-fore the collision, and when it was too late in that mode to avoid said collision.

22. From 4 o'clock on the morning of said fifteenth day of Sep-tember the steam-whistle of the steamer was not sounded until after the lights of the schooner were discovered, nearly ahead of the steamer, at the time when the signal to stop was given, and not more than one minute before the collision—probably not so long— and when too late to avoid the same.

23. From half-past 4 A. M. till the collision there was no lookout

on the steamer other than the second officer, Douglas, who acted as lookout in the absence of the special lookout, while getting his coffee, as in these findings before stated.

24. In the condition of the atmosphere and the state of the fog, there was no fault on the part of those on the schooner in not discovering the steamer at an earlier point of time than that at which it was discovered.

25. When the approach of the steamer was first discovered from the schooner it was too late for those in charge of the latter to avoid the collision.

26. Immediately after the approach of the steamer was discovered from the schooner the helm of the latter was put hard a-port, but owing to her low rate of speed this could have affected her course but little prior to the collision, and this was the first maneuver on the schooner after a discovery of the steamer. This, under the circumstances, was not an improper maneuver. At about the same time the helm of the steamer was put hard a-starboard. Had it been put hard a-port the probability is that the vessels would have gone clear.

27. At the time when the approach of the steamer was discovered from the schooner the course of the steamer was either S. two points E., or due S., and that of the schooner N. E. $\frac{1}{2}$ N.

28. At the time the helm of the steamer was ordered hard a-starboard the steam-whistle sounded, and the engineer was signaled to stop and back the steamer,—all of which orders were promptly executed. It was too late to avert a collision by those movements, but it is probable that had the helm been put hard a-port instead of hard a-starboard the collision might have been avoided.

29. The fair value of the schooner was $11,000.

30. The value of the money and other property lost by John Bott, the captain of said schooner, for which he is entitled to recover, is $440.

#### CONCLUSIONS OF LAW.

1. The steamer was in fault under the circumstances shown by the claimant's own testimony, taken in the most favorable light for claimant, in not blowing its whistle to attract the attention of the schooner and warn it of the steamer's approach.

2. Those in charge of the steamer at the time were also in fault, even upon their own showing, in not stopping the steamer or checking its speed in time to avert the collision; and especially so since the schooner was in plain view for a distance of a mile and a half, and for a period of from at least five to eight minutes, and since the officer in charge was still confused and uncertain as to the movements of the schooner in ample time to have stopped the steamer, or diminished its speed, until the maneuvers of the schooner could be definitely ascertained.

3. That the schooner was not in fault.

4. That the collision arose in consequence of the fault in the navigation of the steamer.

Let a decree be entered in favor of the libelants for $11,000, the value of the schooner, and interest at 6 per cent. per annum from September 15, 1878; and in favor of the libelant Bott for the sum of $440, and interest thereon from the same time and at the same rate, and for costs.

*Milton Andros,* for libelant and appellee.

*Hall McAllister,* for claimant and appellant.

SAWYER, J. In this case I have examined with great care the voluminous testimony, and considered it in all its bearings.

After examining the record I find that I am compelled to concur with the district judge, and that the decree of the district court must be affirmed. For opinion of district judge, see 6 Sawy. 118.

The facts as I have written them out in the findings are as follows: [The findings are set out in the statement.]

I shall not attempt to go over and discuss the large mass of testimony in the case at any length. I shall only state some of the salient points. One point is as to the maneuvers of the schooner. I see no reason to doubt, from the testimony of those on board the schooner, as to its movements. The testimony seems to be fair and unprejudiced. There is no direct testimony to the contrary. So far as the testimony is given at all it is concurred in by all those on the schooner—three or more witnesses—as to what took place at and immediately before the collision. The position of the schooner on the night previous, the object of running off and then running in for the purpose of making the river, would not call for any other changes in the movements of the schooner than those shown by the testimony of those on board to have taken place.

They were running, according to the testimony, upon a course that we should naturally expect them to be running, without any cause for changing the course, unless they had seen the steamer and changed the course for that reason. The testimony of the three witnesses on the schooner was that they did not see the steamer until the time mentioned in the findings,—that is, until she had got within about three ships' lengths of the steamer,—although they were on the lookout, and there was a good lookout. The helmsman himself, as well as the regular lookout, was also on the lookout, because he had instructions to keep a sharp lookout for the shore, and they were on the lookout for the shore. I think there is no doubt about the rate of speed at which the schooner was going, which did not exceed three knots, and was probably considerably less.

That being so, they were running directly on their proper course until the helmsman first heard the sound of the paddle-wheels of the steamer, which he supposed was the surf breaking upon the shore. He then immediately gave his wheel one turn to port, fixed

it in that position with a diamond screw,—the object being to be able to go about quickly should it prove to be necessary,—and ran forward in haste to see whether his suppositions were correct or not. About the same time the lookout himself also heard the sound of the steamer's paddle-wheels. He was on the lookout to see what it was, and he also supposed it was the surf breaking on the shore. This place, as I understand it, is not the track in which the Oregon steamers generally go. They frequently go there when there is particular occasion for it, such as winds or currents; and they seem on this occasion to have been in-shore further than usual, for the purpose of getting the advantage of the current. The steamer's approach was not noticed, although there was a lookout, and the helmsman himself was also on the lookout, until after the sound of the paddle-wheels was heard. The helmsman and lookout first discovered the loom of the steamer. Immediately on the discovery the lookout began to halloo, to attract the attention of those on the steamer; and the other man blew the fog-horn and then ran aft to his wheel again. The captain, hearing the noise on deck,—being close by and being partially dressed,—sprang on deck, seized the wheel, and seeing the steamer coming directly head on, put her helm hard a-port; and that is the first maneuver on the schooner after the discovery of the steamer, and it was then too late to avoid the collision by any movement the schooner could make.

On the question of fog, the testimony of all the parties, both those on deck and those below, was that soon after the 4 o'clock watch came on deck a fog came up. The helmsman said he thereupon passed the fog-horn forward to the lookout to blow, and he testified that the lookout did blow it at intervals, not exceeding five minutes, from that time until the collision. The lookout testifies to the same thing. The cook was on deck, and also testifies to the same facts. The captain, though below, also testifies to hearing the fog-horn blown; so that unless these four witnesses all testify to what they must absolutely know to be false, there must have been a fog; otherwise, also, there would be no occasion for blowing the horn. They testify that there was a fog, and that the horn did blow at regular short intervals.

There were a good many witnesses on the steamer, being passengers, who testify that there was a fog, and the crew, or quite a number of them, testified that there was a fog came on soon after the accident. Some witnesses, employes on the steamer, though not so many, testified that there was no fog at the time of the collision; but they also testify that the atmosphere was overcast, or dark, and was smoky or hazy, resulting from fires upon the land. Immediately after the collision they began to rig a line on the steamer to enable the lookout, instead of the man at the wheel, to sound the fog-whistle. That indicates that there must have been some fog, or they certainly would not so soon have been rigging that line; and all the tes-

timony is that soon after they started, they being detained from 20 minutes to half an hour, and after they got under way, they ran into a fog-bank, then blew the whistle by means of this line which had been rigged while they were picking up the passengers who had been on board the schooner.

I think the great weight of testimony is that there was either a fog or smoke or haze, one or the other, or both, along the track of the schooner, which would be very likely to obscure the view of the steamer's lights. The testimony on board of the schooner is that they first saw the loom of the steamer before seeing the light, and very soon after that they first saw the light at the mast-head. The lookout of the steamer also testified that he first saw the schooner from a mile and a half to two miles off, and before seeing her lights. I have taken a mile and a half as the distance. He says he first saw the schooner, and soon after he saw the green light, when he got within about a mile, so that he saw the schooner first. Several credible witnesses—and among others was the captain, who is certainly a reliable witness and an experienced man—said that in a fog of that kind, or smoke, he would be likely to see the loom of a vessel before seeing the lights. That may be so, but at all events I should suppose that without a mist or smoke or fog, when it is simply dark, the lights of the vessel could be seen before an object which is also black or dark. My conclusion, therefore, is that there was considerable fog, mist, or smoke; probably both. The testimony indicates that there were fog-banks from time to time. I find, therefore, from those general facts that the course of the schooner was as I have stated in the findings, and that there was a fog or mist or smoke, or both, sufficient to obscure the view of an approaching vessel and excuse the schooner for not seeing the steamer in time. It is very manifest that after the steamer's approach was seen, and when the first maneuver on the schooner was made, it was too late to avoid a collision by any action on board the schooner.

The statute requires the court to make findings of fact. In an admiralty or equity case there is difficulty sometimes in stating specifically in brief terms the facts. It is somewhat difficult to specify satisfactorily the ultimate facts, or even to determine what they are, without argument; and I state them rather in the alternative, giving the claimant the benefit of the strongest statement of facts in his favor as made by Mr. Douglas, the mate, who was in fact the only one who testifies to anything on behalf of the steamer, as to the leading material facts, except so far as he is confirmed by the man who was looking out of the port. He testified to seeing the green light, and that he soon afterwards saw the red light from the deck. If Douglas saw the schooner a mile and a half or two miles off, as he says he did, the schooner being then a point off his starboard bow, he, having full control of the steamer's movements, certainly ought to have been able to avoid a collision; and it was inexcusable negli-

gence not to have done so. Considering the rate of speed at which they were going, and the distance and time, I do not see, if he is correct in his statement of facts, how it was possible for the schooner to get in the track of the steamer so as to come into collision, even if it had made the attempt.

He, Douglas, says it was a mile and a half off when he first saw the schooner, a point off his starboard bow. A mile distant is the nearest point that he locates the schooner at the time he first saw the green light; and immediately upon seeing the green light he put his helm a-starboard, whereupon the steamer went off two points more to port, which would make three points. It seems to me if that was the position of these vessels, and the steamer continued in that course, whatsoever course the schooner could have possibly taken she could not have brought herself into collision with the steamer even if she had tried to do so. The witness, Douglas, testifies that one point off would carry the vessels a quarter of a mile apart, and that two points more would carry them at least a mile apart. If the steamer then ran on that course, which he says she was, going at the rate of eight miles an hour by steam, accelerated one mile by the current, and the schooner's speed not exceeding three miles per hour, before the schooner could possibly intersect the line of the steamer's course at any point, it seems to me that the steamer would have been a mile or two past, or at least a long distance past, the point of intersection. Had the schooner turned and run directly at right angles she would have had a mile to sail to intersect the steamer's path. While she was running that mile the steamer would have run three, and been two miles past, as they were but a mile apart at the start. Had the schooner run in any other direction she would have had more than a mile to run to intersect the steamer's track, and the steamer would have been still further off. Some allowance must doubtless be made for the time it would take the steamer to change her course after putting the helm a-starboard, but not enough to render a collision possible. There is some confusion in the testimony of Douglas. It is very remarkable, too, that the man at the wheel did not see the steamer, although it was not his business to act as lookout, because his attention was called to it twice,—first, when he was directed to put his helm to starboard the first time, when the vessel was at least a mile off, and then again when the two lights came into view and the steamer was three-fourths of a mile off. At that time the mate walked back—left his post and walked back abaft the wheel-house—and told the man at the wheel that he had lost the lights of that vessel, and to be careful and be upon the lookout. Even after that warning, when he would be very likely to look out, the man at the wheel did not see the schooner; and he never saw it until the last order was given to put his helm hard a-starboard, signal the engineer to stop the steamer, and blow his whistle to alarm the passengers; and then the steamer

was coming directly down close on the port bow of the schooner. The officer in charge certainly should either have put his helm long before he did hard a-starboard, or he should have ported his helm when he saw the schooner was changing its course, and, in either event, he had ample time to escape a collision. If he had ordered the helm a-port when he saw the green light and the red, or hard a-starboard, or stopped or slowed down the steamer, as he might have done, he would have gone clear. If he had done either when she was three-fourths of a mile off, as he could have done when he saw the green light disappear and the red light come into view, or both lights come into view, and then both lights disappear, the collision would not have occurred.

I am taking this testimony as Douglas gave it, and as corroborated by the man at the port below; and that is the most favorable position according to his own statement. If it was smoky or hazy or foggy, or both, then he was at fault in running at full speed without blowing his whistle from time to time. The whistle was never blown, while the vessel was all the time going at full speed. While I do not propose to say that Douglas' testimony is willfully false, yet the inclination in my mind is to think that in his confusion—as he evidently was confused, and so states in his testimony—the probability is that he did not see the schooner so soon as he supposes, or until he was close upon her, (that is the most favorable view that could be taken, according to the probabilities,) and that then it was too late, by that maneuver at least, to avoid the collision. He saw the red light, and he should have ported his helm, in the condition he was in, instead of putting it starboard. He could have done his best, at least, to check the speed of the steamer in time; and if he did not see it in consequence of fog or smoke, which is highly probable, then he was in fault in running at full speed, and in not blowing his whistle from time to time to give notice to any approaching vessel. If he saw the schooner changing her course three-quarters of a mile off, as he says he did, he certainly should have blown his whistle and done something at once more vigorous and decisive to avert the accident.

I can come to no other conclusion than that the collision was the result of fault in the navigation of the steamer.

I have also examined the testimony to see if there is any reasonable ground for dividing the loss, but I find none.

I see no good reason for reaching a conclusion different from that attained by the district court as to the value of the schooner. The libel alleges the loss sustained by the libelant Bott to be $440, and prays a decree for that amount. A larger amount is, therefore, not within the issues or the prayer for relief. The decree will be limited to that amount