### LOUISVILLE & CINCINNATI PACKET CO. v. UNITED COAL CO.

(Circuit Court of Appeals, Sixth Circuit. April 6, 1915.)

No. 2502.

.1. Collision ☜71—Moving and Moored Vessels—Excessive Speed.
    A steamer left her landing at Cincinnati in the evening and proceeded
    down the river at a speed of from 10 to 18 miles an hour. The night was
    generally clear, but dark. When a short distance above the Southern
    Railroad Bridge, estimated by witnesses at from 300 feet to 300 yards,
    she entered a bank of fog or smoke, which made it impossible to see the
    shore or bridge lights until within 200 feet of the bridge. On entering the
    bank the speed was reduced, but was again increased to full speed when it
    was seen that she was about to strike a pier. Instead of passing through
    the channel span, she passed to the south of the pier through the draw
    span, and at a distance below of from 175 to 450 feet came into collision
    with and sank the outer one of a fleet of coal barges moored near the
    Kentucky shore. She was going at full speed. The master and pilot
    knew the locality, that there was likely to be fog or smoke in the bend
    above the bridge, that it was usual for fleets of coal barges to moor where
    · these were, and that they frequently extended farther into the river.
    Held that, under the rule that a vessel in motion must exonerate herself
    from fault for collision with a moored vessel by showing that it was not
    within her power to prevent it, the steamer had not sustained the bur-
    den of proof resting upon her, but that those in· charge were negligent,
    under the known circumstances, in not .moving at such moderate speed as
    to keep her well under control, and that she was liable for the collision.
        [Ed. Note.—For other cases, see Collision, Cent. Dig. § 101; Dec. Dig.
    ☜71.
        Collision rules, speed of steamers in fog, see note to The Niagara, 28
    C. C. A. 532.]
2. Collision ☜129—Suit for Damages—Damages Recoverable.
    The owner of a vessel sunk in collision in a navigable stream is enti-
    tled to recover the necessary expense of raising her, to determine whether
    she may be advantageously repaired, and also to prevent her becoming
    an obstruction to navigation.
        [Ed. Note.—For other cases, see Collision, Cent. Dig. § 283; Dec. Dig.
    ☜129.]

Appeal from the District Court of the United States for the Western
Division of the Southern District of Ohio; John E. Sater, Judge.

Suit in admiralty by the United Coal Company against the Louisville
& Cincinnati Packet Company, as owner of the steamer Lizzie Bay.
Decree for libelant, and respondent appeals. Affirmed.

C. H. Stephens, of Cincinnati, Ohio, for appellant.
Robert Ramsey, of Cincinnati, Ohio, for appellee. ·

☜For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Before WARRINGTON, KNAPPEN, and DENISON, Circuit Judges.

PER CURIAM. [1] The facts involved in this appeal, including the trial judge's summaries of the testimony of most of the witnesses, appear in his opinion. Study of the record and the briefs satisfies us that the controlling facts and appropriate principles of law were fully considered and rightly applied. An extended opinion here would of necessity result in substantial repetition of the opinion under review, and would obviously serve no useful purpose. We may remark, however, that the appellant failed to discharge the burden resting upon it, as owner of the moving boat (the Lizzie Bay), to show the exercise of reasonable care to avoid collision with the moored barge in issue. One distinct fault was that the navigators of the Lizzie Bay commenced too late to bring her under control. Their admitted knowledge of facts like these: Lack of mooring facilities above the Southern Railroad Bridge, insufficient lights maintained on the bridge, tendency of fog and smoke to accumulate in that vicinity, in connection with the claimed difficulties attending the stopping or turning of river steamboats— clearly required these navigators to operate the boat at such moderate speed as to keep her well in hand until they passed the Southern Bridge. The absence of a schedule distinctly fixing times of arrival and departure respecting points reached by the boat plainly admitted of this course. We may add that the navigating officers of the Lizzie Bay, including her captain, were perfectly familiar with the mooring of barges at the point of collision; and, moreover, the evidence fairly shows that the barges so moored did not then extend as far from shore as usual. We therefore do not see how the appellee can rightfully be placed in fault. These are some of the considerations which lead us to approve and adopt the opinion of the trial judge, which follows. The decree must be affirmed, with costs.

### Opinion of Trial Judge.

SATER, District Judge. The Lizzie Bay left the Cincinnati wharf December 8, 1905, about 6:30 p. m., for Madison, Ind. At that time and place the night was clear, but dark. The atmosphere was damp and heavy, and somewhat smoky, but not enough to interfere with navigation. The smoke had a tendency to settle down. There were from 30 to 40 feet of water in the river, with a current of 5 to 6 miles per hour.

As the boat proceeded down the river, to pass beneath the bridge of the Cincinnati, New Orleans & Texas Pacific Railroad Company, it worked somewhat toward the Kentucky side. The shores and the light and barges along them could be seen until the boat got a short distance above the Southern Bridge, when it entered a smoke and fog, not previously seen, so dense as to shut off all view of the lights and render the bridge invisible. At the channel span, through which the boat was designed to pass, was suspended a green light to indicate the center of such span, and on each of the supporting piers was a red or danger light; but these lights were all small. When the boat entered the fog it had traversed perhaps 2 or 3 miles, and was running at a speed variously estimated at from 10 to 18 miles per hour. The pilot says it was going at a full head of steam, and he estimates its speed at 18 miles per hour. Morris, the mate, puts it at from 10 to 12 miles. The shape of the Kentucky hills was discernible, and served as a guide to the boat on its downward course. According to Thomas, the pilot, when he encountered the fog, the boat was near the Kentucky shore, a third of the way out in the river from that shore. He could see the "black of the hill," even in the fog; but he could

not tell how close he was to the Kentucky shore, until he saw the pier. He says the boat was to the left of the pier when it entered the fog, after which he could not see any shore lights. The men on the boat, until they were about to collide with the pier, at no time saw the outline of the bridge or the lights on it. The point at which the smoke and fog was entered is variously estimated by the witnesses to be from 300 or 400 feet to 200 or 300 yards above the bridge. The pilot makes varying estimates. He testifies that the boat encountered the fog a few hundred yards above the bridge, that he could see the shore lights until the boat ran into the fog 200 yards above the bridge, that the point at which the fog was entered was perhaps within less than the last-named distance from the bridge, that such point, he supposes, was between 200 or 300 yards above the bridge, and that when he was about 150 yards above it he could see the lights on either shore about the time the fog came up. The captain says the boat struck the fog at 200 or 300 yards above the bridge. The Southern Bridge, even under favorable circumstances, on account of a bend in the river, is not visible from the upper bridge, under which the boat had passed, except in case of very high water, until within a distance variously estimated from 300 yards to a quarter or half a mile therefrom. The presence of the bridge was not known until it was only from 185 to 200 feet distant, and was first made known by the passing of a train. When the bridge was first seen, the boat was about to strike the second pier from the Kentucky shore. When the fog was entered, the fog whistle was blown and a stopping bell was rung to shut off steam and slow down the boat. On the discovery of the danger of colliding with the pier, the signal was given for a full head of steam to clear the pier. The boat did not pass under the channel span, but was forced to pass south of it on the Kentucky side of the pier under the draw span.

Below the bridge was a fleet of moored barges. One witness says they were 175 feet distant from the bridge, another at a distance of 300 feet, and still another at a distance of from 400 to 450 feet. The captain testifies that he saw the lights on the barges at the same time that he saw them on the pier; i. e., when the boat was from 185 to 200 feet distant above the bridge. As the boat passed south of the pier through the draw span, an effort was made, so parties on the boat testify, to head it into the river away from the barges to escape collision. One witness testifies, however, that it kept straight on its course. It was then running with a full head of steam. It struck the outer barge, loaded with coal, broke the end off of it, and sank it. The boat was also damaged.

The bridge and the lights on it were not seen at any time until after the boat had passed through the smoke and fog. Indeed, the captain says that he was not looking for the bridge, but was watching the lights on the shore to see if there were any boats around. After the stop signal was given, the boat, then having considerable headway on account of its previous speed, proceeded at a reduced rate until the full head of steam was put on to avoid the pier.

Robinson, who was on the coal fleet at the time of the collision, 500 to 600 feet from its head, saw the boat and hallooed as it struck the barge, which he says was from 400 to 450 feet below the bridge. From his location he could see the red lights on the pier and the green light on the channel span. There were lights on the upper and lower ends of the barges and on the outside of them about the middle. It is difficult for him, he says, to recall the conditions that night; but it was an ordinary night and with little smoke. He has seen smoke come down in the location of the barges, but he does not know whether there was smoke or fog above the bridge. Just before the collision he heard the ringing of backing or go-ahead bells, but does not recall hearing any one on the hurricane deck.

Cleveland, who was with the Pittsburgh Coal Company (which had a barge quite close to the bridge), and witnessed the collision, was standing near the pier. The boat, he says, did not change its course until it got to the fleet, and was coming rather swiftly and without slackening its speed. He could not say whether there was smoke, or mist, or fog, but did not notice any. The accident occurred below him about twice the length of his barge, which was at the bridge. He saw the boat first when it was a short distance above the bridge.

Schauble says the night was moderately dark. He noticed no mist, fog, or smoke, but cannot say what the fact was as to the same above the bridge. He was below it, and could see the lights on the bridge on its Ohio side. He could not see above the bridge on account of the bend in the river, and because the piers more or less obstructed his view. He was somewhat excited at the time over the loss of the barge, but still a credible witness. He cannot say whether the night was very dark, or whether there was a fog coming down, or whether the atmosphere was heavy or not, or whether or not the smoke had settled at the end of the bend above the bridge.

Love, a coal shoveler, saw the boat when it was between the pier and the barge, coming with a pretty good speed and without slackening. He noticed no fog or smoke, and could see the lights on the bridge and the Independent fleet. He does not know the condition as to smoke that night at the Southern Bridge, but says it sometimes settles down in the bend, making it hard to see. He is unable to state the condition of the weather, but does not remember seeing fog, or dust, or anything above the bridge.

Menges, who left his Ludlow landing about 6 o'clock, 200 yards below the collision, says that he thinks it was the worst night he ever saw on the river. He thinks a light at the landing could not have been seen 15 or 20 feet away. The weather was calm, without wind. The fog extended about three squares above the bridge.

Taking the testimony as a whole, it must be held that there was a bank of fog and smoke above the Southern Bridge, which earlier in the evening extended below it. The record suggests that the fog which Menges describes had lifted at and below the bridge after 6 o'clock, but that it still remained above, obscuring the bridge and its lights, at the time the Lizzie Bay entered it.

The barges of the coal fleet were 6 abreast. There had been times when there were as many as 10 or 11 thus lashed together. There was also a pump boat 18 feet wide sparred out from the shore 20 to 25 feet. The spar boat was 26 feet wide, and 15 to 25 feet from the shore. Schauble says the barges extended out about 200 to 225 feet from the shore. Robinson, the watchman in the fleet, says they were 150 feet distant from the channel. Moody testifies that the coal fleet extended into the river beyond the second pier the width of two barges, but the pilot does not state it so strongly, for he says the coal fleet monopolized the biggest part of the space between the shore and the bridge. The photographs introduced in evidence give uncertain information, because the respective points from which they were taken are not shown. The evidence does not show the distance the barges usually extended into the river, or that the distance that evening was unusual.

There was no green light suspended from the draw span (which is only about 100 feet wide) to guide navigators. Robinson testifies that the water under the span was sufficient for a boat, but that it was navigated in fact only by private parties, and that boats of the size of the Lizzie Bay could not have gone between the piers which support it.

Cleveland's evidence is that there was just room for the boat between the pier and the barges of the Pittsburgh Coal Company.

Thomas testifies that the draw span was fixed for many years so that it might be open for boats, but he does not say that such use of it had been recent, nor did he know its condition on the night in question. The draw span had been opened on many occasions, and he has many times known of boats going under it when it was closed. There is plenty of water there at a 10 or 15 foot stage, but not as much as the channel would call for; but in a 15-foot stage there would be about 7 feet of water. The captain testifies that he had often passed under the draw span, when there were no barges there, to avoid the current, and that there was good water there on the night of the accident.

Schauble has seen boats pass under the span, but they were mostly upstream boats. Later he added that he had no recollection of having seen any downstream boats pass there, but that with the river at a 35-foot stage there was good water between piers 1 and 2. He never noticed boats passing beneath the span when the stage of the water was as on the evening in question.

That the span might be used for the passage of boats is suggested from the nature of its construction. It was to some extent so used. The fact that

it is a draw span implies its contemplated use in high water rather than low water. The absence from it of a suspended green light, its width of only about 100 feet, the presence of lights to point out the channel span, and the slight use made of the draw span, render it clear that it was not ordinarily used in the course of navigation, and was not intended for use at the time of the accident.

The evidence shows that, when the bank of smoke and fog was entered, the boat was going at a high rate of speed, without certain knowledge on the part of its officers of its location or distance from the Kentucky shore. The pilot's uncertainty as to the distance of his boat and the fog bank from the bridge is noticeable and significant. Mere darkness would not have obscured the lights on the bridge. That they were not seen was in itself notice that something other than darkness concealed them, and his experience, as well as that of the captain, should have made known to them that, in that locality, the cause of the obscuration was smoke, or fog, or both. The testimony of Menges destroys the theory that the smoke and fog suddenly came upon the boat. It was the boat that suddenly came upon them. They were hanging and had been hanging in that vicinity for some time. Considering the force of the current, the speed of the boat, the character of the evening, and the conclusion which should have readily been drawn by experienced rivermen from their inability to see the lights on the Southern Bridge, and their want of knowledge as to their location, the pilot and captain were not practicing good seamanship.

In view of the fact that the bridge lights were discernible from 185 to 200 feet from the bridge, the bank of smoke and fog was a narrow one, whether the point of its entrance was the minimum, the maximum, or the average distance therefrom as named by the witnesses, and considering the speed of the boat as stated by the pilot, to wit, 18 miles per hour, or the minimum speed of 10 miles per hour, as given by another witness, the time in passing through the bank was necessarily brief. The momentum of the boat and the force of the current were such as to interfere with any great checking of its speed in the brief time in which it was in the fog. The presence of the piers made navigation dangerous, and in anticipation of such danger there was not, under the circumstances, an exercise of due care on the part of those in control.

Schauble testifies that the place of collision has been used as a coal harbor for 15 years. The barges were sometimes lashed together 8 or 10 abreast, and consequently extended on such occasions much farther into the river than on the evening in question. The pilot knew that for a great many years a coal fleet had been located close to the bridge and at the point where the barges were situated that night. The captain saw the identical fleet of barges at the mooring on the morning preceding the accident. Both the pilot and the captain should have known and remembered the location of the coal fleet, and used due care commensurate with the circumstances to avoid it. The character of the skill and knowledge required of the pilot is as set forth in Atlee v. Packet Co., 21 Wall. 389, 396, 397, 22 L. Ed. 619, and Davidson Steamship Co. v. United States, 205 U. S. 187, 27 Sup. Ct. 480, 51 L. Ed. 764. The boat, being in motion, was required to keep out of the way of the barges at anchor, if there was no fault in the location of the latter, unless it appears that the collision was the result of inevitable accident. The rule is that the vessel in motion must exonerate itself from blame by showing that it was not in its power to prevent the collision by adopting any practicable precautions. The Virginia Ehrman, 97 U. S. 309; The Lucille, 169 Fed. 719.

The libelant asks recovery as follows: For loss of the cargo of coal, $829.50; for repairs of boat, $985; for services of the steamer Helen White in raising the barge, $525; for pumping boat, in raising the barge, $152.50; for wharfage, $2; for lumber for temporary repairs for towing barge, $30; for towing the barge to Pittsburgh, $100; for 63 days' demurrage, $126; total, $2,759.

[2] The libelant is entitled to be reimbursed for the necessary expense of raising the barge, to determine whether it could be repaired advantageously or not, and because it was liable to become an obstruction to navigation. The Reno, 134 Fed. 555, 67 C. C. A. 479; The Chauncey M. Depew (D. C.) 59 Fed. 791; The Venus (D. C.) 17 Fed. 925. The barge originally cost $1,550. Where the final claim for damages exceeds the full value of the vessel at the time,

of the loss, the claim should be carefully scrutinized, and the libelant held bound to show special circumstances to justify any such excess, and that good faith and reasonable prudence and good judgment have been exercised in making repairs. The Venus, supra. The libelant claims too much. No survey appears to have been made to ascertain the amount of repairs necessary to reinstate the barge to its previous condition, and no estimates of any kind were obtained until after it was removed to Pittsburgh. Apparently without any preliminary investigation to ascertain whether it was worth raising and repairing, or what it would cost to remove it and repair it, it was raised, removed, and repaired. The conclusion reached is that the items of $829.50 for the coal lost, $985 for repairs, $375 for the services of the steamer Helen White, $152.50 for the pumping boat, $2 for wharfage, $100 for towing, and $39 for lumber, with interest on them from the date such items of expense were respectively incurred, should be recovered by the libelant. In other words, $529.50 are allowed for the raising of the barge and removing it as an obstruction, and $1,124 for its repair. There is no evidence of the value of the barge at the time of the collision. There had necessarily been a depreciation from use. My purpose is to make the last-named amount such a sum as would fairly equal the value of the barge at the time of the collision.

The item of $375 is allowed in lieu of that of $525, on the evidence of Boyd that $5 an hour is charged by his company for work of a kindred character. The other claims, and the libelee's claims for damage, are disallowed.