## THE WYOMISSING.

## THE ASHBOURNE.

## BROWN v. READING CO.

### No. 5129.

Circuit Court of Appeals, Third Circuit.
April 17, 1934.

On Rehearing Sept. 4, 1934.

Barry, Wainwright, Thacher & Symmers, of New York City (Earle Farwell, of New York City, of counsel), for appellants.

Macklin, Brown, Lenahan & Speer, of New York City (J. Dudley Eggleston, of New York City, of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and THOMPSON, Circuit Judges.

WOOLLEY, Circuit Judge.

Arthur Kill, a natural waterway, divides Staten Island from New Jersey. Following a winding course in a general north and south direction, and being made navigable by constant dredging, it is used as a convenient shortcut for craft of all kinds and particularly for tows moving between New York and Port Reading.

Early in the morning of August 27, 1930, during a heavy fog, a tow belonging to the Reading Company came into collision with a Drill Boat owned by the New Jersey Salvage & Dredging Company, and chartered, and then operated, by the New Jersey Shipbuilding & Dredging Company in deepening the channel of the Kill through rock formation. The Drill Boat was damaged. The receivers for the charterer filed a libel in the District Court of the United States for the District of New Jersey against the two tugs in charge of the tow. The case came to trial on a petition in admiralty filed by the Reading Company, owner of the tugs, for exoneration from or limitation of liability. On findings that the tugs were not at fault and that the fog bell of the Drill Boat was not seasonably sounded the trial court entered a decree for the Reading Company and its tugs. The receivers for the charterer of the Drill Boat took this appeal.

The factual situation in this case is unusual in that there are two stories of the collision, as told by the respective parties, which on the undisputed primary facts are wholly opposed one to the other in the intended inferences of negligence yet, we think, are consistent with each other upon the ultimate fact as to the cause of the collision. It seems to be a case where everybody is telling the truth and where, in consequence, the testimony for both parties must, if possible, be accepted or the testimony for one party or the other be arbitrarily ignored in reaching a judgment.

On the night before the collision the tug "Wyomissing," assisted by the tug "Ashbourne," left the Upper Bay, New York, with twenty-nine light coal barges in tow bound for Port Reading. The tow was made up of seven tiers of four boats abreast with one boat tailing the last tier. The "Wyomissing" was ahead. She was the dominating tug. On her depended the navigation of the tow. The "Ashbourne," acting as helper, was made fast on the starboard side of the tow abreast the starboard boat in the sixth tier. The tide was ebb, that is, running to the southward, in the same direction the tow was proceeding. The weather was fair with no wind of any account and so continued until the tow was rounding Tremley Point, well down the Kill, when a thick fog was observed coming in from Staten Island. In the forward tug a pilot was at the wheel, a deckhand sitting nearby, and the captain off watch. The pilot immediately sent the deckhand to the bow of the tug as a lookout, slowed down to one bell and commenced (and thereafter continued) to sound regulation fog signals. When the fog shut in, wholly blotting out all navigation landmarks, the pilot was confronted with this situation: His tug was in charge of a tow of more than 1000 feet in length; it was on the northerly side of Tremley Point moving southwardly around that bend of the Kill on an ebb tide which, as is known to all pilots, sets the tow out of the channel eastwardly toward the Staten Island shore. It was impossible or, from the standpoint of a marine maneuver, impracticable to stop the tow midstream, for such an attempt would inevitably result in the tow, propelled by the ebb tide, piling up upon the tug. Nor was it possible or practicable to maneuver the tow through the winding Kill when blinded by fog. So the situation, as thus far stated, admitted of a maneuver, common in such cases, of rounding to, that is, to head the tug across stream towards the dock of the American Cyanamid Company on the New Jersey shore, allow the ebb tide to set the tow down stream, then move upstream against the tide, tie up at the dock and wait for the fog to lift. But this maneuver was questionable in view of the fact, known to the tug's pilot and her captain, that the Drill Boat had for several months been working at different locations on a rock ledge beneath the river south of Tremley Point and that she probably was some-

where in that vicinity. Before the fog shut in, the pilot of the tug did not, and, probably because of the bend of the stream, could not see the Drill Boat or her lights. On hearing his tug's fog signals the captain, leaving his berth, went to the pilot house and asked the pilot for the tug's position. On being informed, he asked: "Where is that digger?" The pilot, not having seen the Drill Boat and not having heard her fog signals, answered: "I don't know." The pilot and captain of the tug were alert to the probable presence of the Drill Boat somewhere below the bend and were fully aware of its danger to the tow in any maneuver it might make. Discussing the situation, they listened intently for her fog signals, because on her presence and position indicated by her signals, or by their absence, depended the maneuver which the tug must make to protect her tow. Had the Drill Boat sounded signals, or, sounding signals, had they been heard on the tug, the maneuver which the tug would have made was to descend towards the Drill Boat (moored, as it turned out, in the eastern or Staten Island side of the channel opposite the Cyanamid dock), pass her starboard to starboard eastwardly of the channel, turn westwardly across stream toward the New Jersey shore, then, completing the loop, head upstream against the tide and tie up at the Cyanamid dock, leaving the Drill Boat safely within the orbit of the maneuver which (until the tow straightened out) would be in the form of the letter "U." Not hearing fog signals from the Drill Boat—essential to this maneuver—the pilot and captain of the tug concluded she had been taken away or moved off her location and, consequently, began the rounding to maneuver. That was a mistake for shortly after starting the maneuver the tug, when within 200 feet of the Drill Boat, heard her fog signal for the first time. Signalling the helper tug to reverse her engines and thereby stay the movement of the tow, the leading tug cut herself loose. The tow swung around the Drill Boat and caused the injury complained of. Whether the tug's mistake amounts to negligence depends, it would at first seem, on the conduct of the Drill Boat in performing her duty of disclosing her presence and position by sounding fog signals. That is the other story of the case. Before coming to it, we shall dispose of some contentions made by the libellants as to other acts of negligence which they charge to the leading or dominating tug, the first of which is that she was at fault in failing to have a lookout.

Admittedly, the lookout was not at his post before the fog was observed. It is equally certain that he was at his post before the fog set in and that because of its density he would see nothing and, for some reason, he heard nothing from the Drill Boat. We discover no causal connection between the tug's failure to maintain a lookout when the weather was clear and the collision which occurred in the fog, under authority of Ship Blue Jacket v. Tacoma Mill Co., 144 U. S. 371, 12 S. Ct. 711, 718, 36 L. Ed. 469, in which the court said: "It is well settled that the absence of a lookout is not material where the presence of one would not have availed to prevent a collision." The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687. This pronouncement conforms to the principle of article 29 of the Inland Rules for Preventing Collisions, 33 USCA § 221, in respect to neglect of proper precautions. That rule provides: "Nothing in these rules shall exonerate any vessel " * * from the consequences of any neglect * * * to keep a proper lookout * * *." We find that the collision was not a consequence of the tug's failure to have a lookout at his post before the fog set in.

The libellants' next contention is that the petitioner's tugs were at fault in proceeding on the wrong side of the channel in violation of the Narrow Channel Rule and the War Department's Regulations. Article 25 of the Inland Rules for the Prevention of Collisions, 33 USCA § 210, provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

It happened that the Drill Boat was in the extreme easterly side of the channel with plenty of water between her and Staten Island. It was customary for tows descending the Kill on an ebb tide with the drift toward Staten Island not, at this point, to keep to the right of mid-channel, according to the rule, but to keep to the left. This practice was pursued because if the tug and tow passed the Drill Boat on the right—port to port—the drift of the ebb tide would carry them toward, and perhaps into, the Drill Boat. Moreover, if the U maneuver, an admittedly proper one, were to be performed, it was necessary to shape the course of the tug and tow to the left of mid-channel, passing the Drill Boat starboard to starboard, and, after turning, come upstream on the right of mid-channel and tie up at the dock. If, because of the rule, a reverse movement were required, comprising a descending passing on the right of mid-channel, a looping turn eastward, an ascending passing on the left, and then a

cross-course westward to the New Jersey shore to tie up, the maneuver would be somewhat in the form of the letter "S" with the Drill Boat in a position somewhere in its curves with collision almost inevitable.

We find no fault on the part of the tug and tow in abandoning the U maneuver when it heard no signals showing the presence and position of the Drill Boat. The question of fault or negligence arises from the tug's rounding to maneuver (including her position, necessary to that maneuver, on the left of mid-channel) to which she committed herself before she had picked up the Drill Boat's signals.

The story of the Drill Boat is short and certain. Eight witnesses, ranging from deckhands and machinists to the two captains, testified consistently with one another that immediately the fog shut in a member of the crew was sent to the fog bell where he remained sounding fog signals three or four times a minute for ten or twenty minutes before the collision. Moreover, all this time, that is, up to three to six minutes, of the collision, the drills were working, making a noise that ordinarily can be heard a great distance but which in this instance was not heard on the tug.

We cannot, on this evidence, find negligence or even tardiness on the part of the crew of the Drill Boat in sounding fog signals. Nor was there evidence that its fog bell was inadequate in size or sound. Unless we were arbitrarily to ignore this evidence, we cannot find negligence on the part of the Drill Boat. And, similarly, unless we were arbitrarily to ignore the evidence of the tug's crew, we cannot find negligence on the part of the tug. We cannot disregard the testimony of either group of witnesses, for none was contradicted and the credibility of no witness attacked.

This is not a case which is perplexing and difficult of decision because of inconsistency in testimony but is a case in which, after careful study of the entire record, we find all the testimony consistent and pointing very clearly and directly to one ultimate fact, which is that the collision was not the result of negligence of anybody but was a true case of inevitable accident. All lights were set; all signals were sounded, seasonably and adequately. Everyone was alert and watchful. The tugs' signals were heard upon the Drill Boat, not when they were commenced but a few minutes afterward. The Drill Boat's signals, properly begun when the fog shut in and continued for ten or twenty minutes, were not heard on the tug by those listening for them until she was within 200 feet of the Drill Boat, a matter of two or three minutes before the collision. The noise of the drills was not heard at all.

The reason for these curious results may have been pockets in the fog or other atmospheric phenomena with which mariners in contending with that enemy of safe navigation are familiar. Whatever the cause, failure of the tug, though listening all the time, to hear the Drill Boat's signals until too late to avail herself of the Drill Boat's position thereby disclosed, was not her fault and, in consequence, her failure properly to maneuver her tow was not negligence. For these reasons, we are constrained to affirm the decree and notice of settlement here on appeal.

THOMPSON, Circuit Judge (dissenting).

I am unable to concur in the decision of the court. Article 29 of the Inland Rules (33 USCA § 221) provides: "Nothing in these rules shall exonerate any vessel, or the owner or master or crew thereof, from the consequences of any neglect to carry lights or signals, or of any neglect to keep a proper lookout, or of the neglect of any precaution which may be required by the ordinary practice of seamen, or by the special circumstances of the case."

It is admitted that there were no lookouts on the tugs until the fog was observed. The pilot of the Wyomissing testified as follows:

"Q. Where was your lookout stationed when you came on watch, Captain? A. What, the other man?

"Q. Your lookout, when you came on watch, where did you station your lookout? A. When I came on—why, when I came on at 12 o'clock it was not necessary to station the men.

"Q. You didn't have any lookout at all? A. It was not necessary. After we got through—got down through the B. & O. bridge he was in the pilot house then with me.

"Q. When did he come into the pilot house, where were you when he came in? A. Just when I got the other side of the B. & O. bridge.

"Q. Up to that time he had not been on lookout? A. He was down in the place—he was down in the kitchen; one deckhand is kept busy in the kitchen, to keep the kitchen clean for the cook. * * *

"A. He took that station on the bow as I was coming around Tremley Point. He was

up in the pilot house with me, sitting in the chair while the weather was clear, there being no bridge down; and when we seen the fog coming I said 'You better go down in the bow deck, we are going to have a fog the way it is coming in there.' So he went right down in the bow. * * *

"Q. You say the lookout was sitting in the pilot house with you; where was he sitting— what part of the pilot house? A. He was sitting on a chair right behind me."

In the majority opinion the court, commenting on the absence of the lookout, says: "Admittedly, the lookout was not at his post before the fog was observed. It is equally certain that he was at his post before the fog set in and that because of its density he could see nothing and, for some reason, he heard nothing from the Drill Boat. We discover no causal connection between the tug's failure to maintain a lookout when the weather was clear and the collision which occurred in the fog, under authority of Ship Blue Jacket v. Tacoma Mill Co., 144 U. S. 371, 12 S. Ct. 711, 718, 36 L. Ed. 469, in which the court said: 'It is well settled that the absence of a lookout is not material where the presence of one would not have availed to prevent a collision.' The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687."

The facts in Ship Blue Jacket v. Tacoma Mill Co., supra, may be easily distinguished from those in the instant case. It was there conclusively shown that the ship would have avoided collision by keeping her course or porting her helm, but that she changed her course and starboarded her helm. Even if there had been a lookout on the tug, the collision could not, because of the unexpected change of course by the ship, have been avoided.

It appears from the evidence in the instant case that the pilot knew of the approximate location of the drill boat and, notwithstanding that knowledge, attempted, after the fog had set in, to make the maneuver described in the majority opinion. As a result of this maneuver, it was inevitable that the tug, with her long unwieldly tow, would sweep over the area where the drill boat was working. It is a well-settled rule in admiralty that vessels in motion are required to keep out of the way of a vessel at anchor, if the latter is without fault, unless it appears that the collision was the result of inevitable accident; the rule being that the vessel in motion must exonerate herself from blame, by showing that it was not in her power to prevent the collision by adopting any practicable precautions.

The Virginia Ehrman (The Agnese), 97 U. S. 309, 24 L. Ed. 890. See, also, Strout v. Foster, 1 How. 89, 11 L. Ed. 58; Wetmore v. The Granite State, 3 Wall. 310, 18 L. Ed. 179; The Bridgeport, 14 Wall. 116, 20 L. Ed. 787.

The question then is whether, under the evidence, the petitioner has sustained the burden of exonerating the tugs from liability for violation of their duty to keep a proper lookout, as required by article 29 of the Inland Rules, supra. The absence of a lookout is prima facie evidence of negligence. The Ariadne, 13 Wall. 475, 20 L. Ed. 542. The burden was therefore upon the petitioner to establish by evidence that the position of the drill boat could not have been ascertained even if there had been a lookout on duty when the weather was clear, before the fog settled. This requirement is not unreasonable, since it was shown that the visibility was good until such time as the tugs were about 900 to 1000 feet from the drill boat. The obvious inference is that the drill boat, displaying red and white lights, could have been seen by a lookout prior to the settling of the fog and that, if information concerning its exact location had been given to the pilot, the tugs could have safely maneuvered their tow past the drill boat. Conceding that no one can tell what would have happened, had a lookout been on duty in accordance with the Inland Rules cited above, nevertheless the petitioner has failed to show that, if the lookout had been stationed before the fog fell as he should have been, a warning at that time as to the precise location of the drill boat would not have prevented the collision. The Herbert L. Pontin (C. C. A.) 50 F.(2d) 177. My view is that the burden was upon the petitioner to show that the precaution of having a lookout on duty would not have availed to prevent the collision and that the petitioner has failed to sustain this burden. Perth Amboy (D. C.) 48 F.(2d) 640. Dahlmer v. Bay State Dredging & Contracting Co. (C. C. A.) 26 F.(2d) 603. The Madison (C. C. A.) 250 F. 850.

Nor has the petitioner, in my opinion, justified its infraction of article 25 of the Narrow Channel (Inland) Rules (33 USCA § 210), which provides: "In narrow channels every steam vessel shall, when it is safe and practicable, keep to that side of the fairway or mid-channel which lies on the starboard side of such vessel."

The maneuver described in the majority opinion was for the convenience of the tugs and their tow without regard for the safety

of others. The drill boat was anchored about 40 feet from the eastern side of the channel and 320 feet from the western side. Knowing that the drill boat was somewhere within the general location but being unable to detect the exact location because of the fog, the pilot was under more than the routine duty to obey the Narrow Channel Rules and keep to the starboard. Had he done so, the tugs and their tow could have proceeded on the starboard until such time as the drill boat was unquestionably passed, and then made the turn for the purpose of tying up at the Cyanamid Company's dock. There was only a possibility that the tide would sweep the tow into the drill boat if the tugs proceeded on the starboard in obedience to the Narrow Channel Rules, but a collision was certain if the Rules were not obeyed.

My view is that courts in admiralty should require strict adherence to the rules for preventing collision and that the failure or neglect to keep a proper lookout at all times, as well as the failure to obey the rules for keeping to the designated part of the channel, should not be lightly excused. I am therefore constrained to the conclusion that the District Court was in error and that its decree should be reversed.

On Rehearing.

WOOLLEY, Circuit Judge.

Before the fog set in the leading tug did not have a lookout on duty. On reading the majority opinion in this case it will be clear that we knew article 29 of the Inland Rules for Preventing Collisions, 33 USCA § 221, which provides that "Nothing * * * shall exonerate any vessel * * * from the consequences of any neglect * * * to keep a proper lookout * * *." It will also be clear that we were acquainted with the equally settled rule that "the absence of a lookout is not material where the presence of one would not have availed to prevent a collision." The Blue Jacket v. Tacoma Mill Co., 144 U. S. 371, 12 S. Ct. 711, 718, 36 L. Ed. 469; The Nacoochee, 137 U. S. 330, 11 S. Ct. 122, 34 L. Ed. 687. We held the latter rule applied on a finding of fact that this collision was not a consequence of the tug's failure to have a lookout at his post before the fog set in, because at that time the position of the tug, well north of a bend in the Kill, was such as to make it impossible for a lookout, if at his post, to see the Drill south of the bend. We found this fact on the uncontradicted evidence of the captain of the tug who, on being re-

quested, marked on a map the position of his tug when the fog set in by "a point with a circle around it." R–151. Now the point with a circle around it, appearing on the map, is above the bend of the Kill about 4000 feet from the Drill. By laying a ruler on the map from the point showing the position of the Drill to the point with a circle around it showing the position of the tug, it is plain that neither a lookout nor anyone else aboard the tug could see the Drill down the waterway. Tremley Point cut off the water view. Whether the Drill could be seen across the land is another matter. Accordingly we affirmed the decree of the court below denying relief to the claimants-respondents.

The claimants-appellants petitioned for a rehearing on the ground that, notwithstanding the evidence of a point with a circle around it as denoting the position of the tug when the fog set in, we misapprehended the evidence and misconceived the position of the tug and her tow. We allowed the petition and on rehearing the proctor for the claimants asserted and (to our astonishment) the proctor for the petitioner admitted that the point with a circle around it (the only point of that kind on the map) did not denote the position of the tug north of the bend and about 4000 feet from the Drill when the fog set in, but a point on the map without a circle around it south of the bend in plain view of the Drill about 1000 feet away was the mark made by the captain showing the position of his tug when the fog set in.

This concession changes the whole face of the case and brings into operation Article 29. It also brings into operation its companion rule that the burden of exonerating the tug for violating her duty to keep a proper lookout is upon the petitioner. The petitioner's effort to do this by attempting to prove, argumentatively, that the captain, its own witness, was wrong when he marked his tug's position south of the bend, close to and in sight of the Drill before the fog set in, does not persuade us that the presence of a lookout "would not have availed to prevent the collision." Hence we are constrained in this surprisingly reversed situation, to withdraw our previously announced decision and reverse the decree below, with direction that the District Court enter a decree for the claimants-respondents limited in amount to the value of the petitioner's interest in the Steamtug "Wyomissing," the tug dominating the navigation of the tow and the only one proved negligent in not maintaining a lookout, and to her pending freight, if any, on the voyage.

Schuyler's Steam Towboat Line v. Madison M. Caleb, 103 U. S. 710, 26 L. Ed. 467; Liverpool, Brazil & River Plate Steam Nav. Co. v. Brooklyn Eastern District Terminal, 251 U. S. 48, 40 S. Ct. 66, 64 L. Ed. 130; The W. G. Mason (The W. I. Babcock) (C. C. A.) 142 F. 913; The Transfer No. 21 (C. C. A.) 248 F. 459; Erie Lighter No. 108 (D. C.) 250 F. 490.