**THE CATALINA.**

**EDWARDS et al. v. WILMINGTON TRANSP. CO.**
No. 7594–Y.

District Court, S. D. California,
Central Division.
March 6, 1937.

**YANKWICH, District Judge.**

This is a libel, seeking damages to property and person, resulting from the collision between the yacht Arbutus, owned by two of the libelants (the Edwardses), and the steamship Catalina, owned by the respondent and claimant, Wilmington Transportation Company.

The collision occurred in the fog about 5:04 p. m., April 10, 1936, on the Pacific Ocean about seven and one-half miles north of Catalina Island.

The Arbutus is a wooden cruiser yacht, 77 feet long, 15-foot beam, with a gross tonnage of 48, powered by a six-cylinder Atlas Imperial Diesel engine of 120 horsepower. Her engine is controlled from the pilothouse by levers located immediately to the right of the operator at the wheel. She is capable of making at full speed nine knots per hour.

The Catalina is a twin-screw passenger vessel, powered with two triple expansion reciprocating steam engines, length overall 301 feet, 7 inches, length between perpendiculars 285 feet, beam 52 feet, moulded depth 21 feet, 1,766 gross tons, built to Class A–1, American Bureau of Shipping, in 1924, and designed especially for the Santa Catalina Island run. Signals to the engine room from the bridge are given by the usual telegraphs, of which there are two, on either wing of the bridge, from either of which instruments signals to both engines can be given.

On the voyage on which the collision occurred, the crew of the yacht consisted of a master, a deck hand, and a cook. The steamship's complement of crew was 50, with 2 licensed deck officers. She was carrying 474 passengers.

On the yacht, in addition to the crew, were the owners, the Edwardses, and their guests, Walter R. Leeds and May H. Leeds.

The Arbutus took her departure from the breakwater at San Pedro Harbor, California, at 3:22 p. m. At the time, it had the San Pedro breakwater light abeam and steadied on a course of south one-quarter east magnetic. She did not change this position. The weather was clear. The sea was fair. Later, in the channel, there was a windy chop, about west, with a force of about two, by Beaufort scale. About three-quarters of an hour later, the yacht ran into a fog. It was, what the witnesses on all sides have described as, a drifting fog. At times, there was fair light and visibility for a mile or so. Then the fog would close in very thick, limiting visibility to not more than one hundred yards. When the fog was encountered, the master of the Arbutus slowed down to a speed of about six knots. However, he changed the speed when the space would clear, which it did

at various places, for a mile or so. For fifteen minutes or so prior to the collision, she had been going at the rate of about six knots.

At the same time, the master gave fog signals by pulling a chord suspended practically over his head, at the wheel, in the pilothouse. The chord blew an air whistle about sixteen or eighteen inches long, which is blown by compressed air carried in tanks in the engine room, with a maximum pressure of 225 pounds. The compressor was pumping during the entire time, and the pressure, as judged by a gauge in the pilothouse, never went lower than 200 pounds. The blasts were five to six seconds in length, blown at intervals of a minute and a minute and a half. The fog whistle blew from the time the Arbutus entered the fog until the time of the collision.

The master posted a lookout on the port side of the forward deck, outside the pilothouse, at a distance of about twenty-three feet abaft the stem. The deck was painted and there was no rail. It was covered with a canvas which made it very slippery when wet, and which would have made it impossible for anyone to stand lookout except close to the pilothouse. After the yacht entered the fog, the lookout remained at his post up to the time of the collision. The only other duty he performed was to wipe the spray from the glass window of the pilothouse back of which stood the master at the wheel. This he did by using a chamois cloth which he carried in his pocket for the purpose. At 4:46 p. m. the Catalina loomed out of the fog suddenly, and, *apparently,* without warning, bearing down on the Arbutus on an approximate parallel opposite course. The lookout signaled to the master, and shouted: "Steamer, dead ahead!" The master, at the same time, swung the wheel of the Arbutus hard right in the hope that by swinging the yacht as rapidly as possible to starboard and away from the Catalina, he could avoid a collision. The operation was unsuccessful and the stem of the steamship struck the port side of the yacht at a point just abaft the stack and ripped a large hole in the Arbutus back to the stern, tearing out frames and allowing the sea to pour in. The Catalina's anchor fouled the wooden top of the Arbutus which served as a canopy, and ripped it off from the port corner of the pilothouse all the way aft inboard for a distance of approximately two feet, also splintering glass, timbers, and stanchions all along the port side. The yacht became awash aft and its occupants cleared a life boat and made their way to, and were eventually taken aboard, the Catalina. The master of the Arbutus described the events thus:

"Q. By Mr. Black: What was the first knowledge you had of the presence of the Catalina? A. Well, my deck hand saw it at the same time I saw it,—just about. We saw it about the same time. When he hollered, I saw it, too.

"Q. Did you hear any fog signal from the Catalina prior to sighting her? A. No, sir.

"Q. Did anybody on the vessel report hearing a fog signal? A. No, sir.

"Q. From any vessel prior to the time of the collision? A. No.

"Q. What did the deck hand do when he reported the vessel ahead? A. He just hollered. He saw the Catalina and then jumped to the pilothouse door and then over on the other side.

"Q. When you glanced up and saw the Catalina, what was her direction from you? A. She was right ahead.

"Q. What was her apparent course? A. Looked to be opposite.

"Q. What was her distance away? A. Her distance away, I should judge, between 100 and 150 yards.

"Q. Did you observe anything at that moment that indicated to you the apparent speed of the Catalina? A. I saw the stem cutting through the water and the boat increasing in size pretty fast.

"Q. Did you see the stem in the water? A. Yes, sir.

"Q. Did you notice the stem and the water line in conjunction? A. I didn't quite get that.

"Q. Did you notice the point of meeting between the stem and the water line of the Catalina? A. No. I could see the water line. I saw the water.

"Q. What water did you see? A. The bow water, cutting through.

"Q. Do you call that a wave? A. Well, it is a bow wave; yes, sir.

"Q. What part of the Catalina did you particularly see? A. I saw the stem, the bow.

"Q. What did you do immediately you saw the Catalina, if you did anything? A. Turned my wheel to the right, going starboard.

"Q. What effect, if any, did that maneuver have on the direction and course of your vessel, if you know? A. It would swing it to starboard.

"Q. Well, did it? A. Well, it did some; not much.

"Q. Do you think it had any effect as to the point of impact on your vessel? A. Yes, sir.

"Q. What effect? A. Well, if I hadn't swung it, we probably would have been sliced all the way mid-ships right along. In this way, we met a glancing blow that I figured probably saved us."

The events immediately preceding the collision, as they presented themselves to the officers of the Catalina, were: When fog was encountered, the Catalina stationed a proper lookout at her bow on her boat deck forward. He stood within an inclosure made by a chain some six feet from the stem, and remained there up to the time of the collision. The Catalina was in fog of varying intensity from 4:45 p. m. to 5:04 p. m. Her captain, her first officer, and the lookout saw the Arbutus at about the same time. The lookout signaled to the bridge and sang out: "Yacht, dead ahead!"

The captain stated that when the Arbutus was sighted, she was distant "about our ship length." According to the lookout, the Arbutus was bearing *straight ahead, not dead ahead,* or, as he explained it, slightly on the starboard side, on a course not quite parallel, but more crossing from east to west of that of the Catalina. What the captain did is described in his own words:

"Q. When you first sighted the Arbutus, what did you do and what did you observe? A. Immediately upon sighting her, I ordered 'Hard right.' That means hard right rudder.

"Q. To whom did you give that order? A. To the quartermaster and went to the starboard telegraph, moving right along, and told him to telegraph 'Stop.' Stayed there just a moment, to sort of collect my balance and pushed it right down to 'Full astern.' I was on the starboard bridge at that time and I went across to the port wing of the bridge * * * before I left the starboard wing

the Arbutus and the Catalina had come together."

As near as the officers of the Catalina could judge, only five or six seconds elapsed between the time they sighted the Arbutus and the collision. To them the Arbutus seemed to be going full speed, i. e., nine knots. They heard their own whistle just before the collision, but not that of the Arbutus.

The yacht was a total loss.

Libelants Walter R. Leeds, a guest, and William Zorn, the cook, suffered personal injuries. The others suffered loss of personal effects.

The libel seeks to recover damages for these losses and injuries. The respondents and claimant deny fault. By petition, the claimant has also impleaded under Admiralty Rule 56, 28 U.S.C.A. following section 723, charging the owners of the yacht with sole fault and responsibility for the collision.

Thus, each charges the other with being in fault, through excessive speed in fog, failure to give proper fog signals, and to post a proper lookout.

There are brought into play articles 15 (33 U.S.C.A. § 91), 16 (33 U.S.C.A. § 92), and 29 (33 U.S.C.A. § 121), of the International Rules for Navigation at Sea, Inland Rules, art. 29 (33 U.S.C.A. § 221).

In fog or mist, under article 15, a steam vessel, having way, must sound, at intervals of not more than two minutes a prolonged blast—that is, a blast of from four to six seconds duration. Under article 16, the speed in fog and mist must be moderate, having careful regard to the existing circumstances and conditions. Violation by a vessel of the rules as to signals or speed throws upon her the burden of showing that the fault could not have been the cause of the injury. The Pennsylvania (1873) 19 Wall. 125, 22 L. Ed. 148; The Colorado (1875) 91 U.S. 692, 23 L.Ed. 379; The Ancon v. Thompson (C.C.Cal.1882) 17 F. 742; The Nacoochee (1890) 137 U.S. 330, 11 S.Ct. 122, 34 L.Ed. 687; The Umbria (1897) 166 U.S. 404, 17 S.Ct. 610, 41 L.Ed. 1053; The Beaver (C.C.A.9, 1915) 219 F. 134; New York & Cuba Mail Steamship Co. v. United States (C.C.A.2, 1927) 16 F.(2d) 945; Puget Sound Nav. Co. v. Nelson (C.C.A.9, 1930) 41 F.(2d) 356; Novak et al. v. Fishermen's Packing Corp. (1935)

184 Wash. 526, 52 P.(2d) 336, 1936 A. M.C. 34; The Eureka (C.C.A.9, 1936) 84 F.(2d) 496; The Edward E. Loomis (The W. C. Franz) 86 F.(2d) 705, 1937 A.M. C. 54 (C.C.A.2, 1936).

The test for determining what is a moderate speed is an objective one. It depends upon the circumstances in each particular case. The Bayonne (C.C.A.2, 1914) 213 F. 216. The determinative factors are the location of the vessel, the likelihood of her meeting other vessels in the neighborhood, her ability to come to a full and quick stop, and "any and all other circumstances and conditions affecting her own safety or the safety of others." La Boyteaux: Rules of the Road at Sea (1920) p. 78.

In determining whether there has been compliance with these tests, admiralty courts have ruled that a vessel must maintain only "such a rate of speed as would enable her to come to a standstill, by reversing her engines * * * before she should collide with a vessel which she should see through the fog." The Nacoochee, supra, 137 U.S. 330, at page 339, 11 S.Ct. 122, 125, 34 L.Ed. 687. And see The Pennsylvania, supra; The Umbria, supra; The Martello (1894) 153 U.S. 64, 14 S.Ct. 723, 38 L.Ed. 637; The Belgian King (C.C.A.9, 1903) 125 F. 869; The Tuxedo (C.C.A.2, 1935) 77 F.(2d) 354. In practice, the rule means ability to stop within the distance she can see ahead, as some cases put [The Haven (C. C.A.2, 1921) 277 F. 957; The Quirigua (D.C.N.Y.1936) 17 F.Supp. 311], or, as other cases put it, within one-half of the distance of visibility [The Eureka, supra]. This on the assumption that with two vessels coming in opposite direction, both going at moderate rates of speed, the ability of each to stop "within her share of the distance which separates her from another" would, ordinarily, prevent collision. The Sagamore (C.C.A.1, 1917) 247 F. 743, 750.

While the evidence here presents the usual contradictions, there is almost unanimity as to the speed of the Catalina. She was going, according to her captain, at her regular cruising speed, which was fifteen knots an hour. She made 112 revolutions per minute. The pitch of her propellor was 17 feet and the slip was 15 per cent. Thus, adopting the ordinary method of computing actual speed by mul-

tiplying 17 by 112 and deducting the slip —which her chief engineer admitted to be correct—we have a speed in excess of sixteen knots per hour. At either speed, she *could not* have stopped within one half the distance of visibility. That she was going full speed ahead is also shown by the log of her engine room showing the orders received from the bridge before the Catalina sighted the Arbutus:

"4:30 stand by; *4:34 full speed ahead;* 5:00 full speed astern; 5:01 stop; 5:01½ stop; 5:03 slow astern; 5:03½ stop; —— slow astern".

Whether we adopt the entire range of visibility or half of it as the test, the Catalina's speed was immoderate and absolutely unwarranted under the circumstances. Her captain stated that she could have stopped *under* three lengths—903 feet.

*How much under,* he did not say.

If we take the estimate of the naval officer—a commander of the United States Navy, who was a passenger on the Catalina—as to her speed, she was doing better than sixteen knots. *"Closer to eighteen,"* he stated. According to his testimony, even after she reversed her course, "it seemed to me that she carried her way from 700 to 1000 yards before she was brought to a dead stop."

This is, in itself, indicative of her high speed.

But even the speed admitted by the respondents, fifteen knots, was inexcusable, when visibility was only 300 feet. Under none of these estimates could the Catalina have stopped within the range of her visibility. In fact, little attempt has been made to defend that speed. Neither the captain of the Catalina nor the lookout, who sighted the Arbutus at the same time and signaled and sang out to him, could see the lookout on the Arbutus or her master at the wheel in the pilothouse. Of course, the Catalina disputes that there was any lookout posted on the Arbutus at the time of the collision. But *no one* disputes that there was some one on the Arbutus steering her. The fact that neither the captain nor the lookout on the Catalina saw the person at the steering wheel is explainable in one manner only —namely, that the fog was so thick that they could not see either the man inside or the man outside the pilothouse. All these facts lead inevitably to the conclu-

sion that the Catalina was in fault in going at an excessive rate of speed in fog.

■ The evidence as to the fog signals is conflicting. The officers of each vessel deny having heard the signals of the other. I am satisfied that both vessels gave fog signals. And the failure of the officers and crew of each vessel to hear the other's signals may be due to the fact that they may have been blown simultaneously so as to affect the ability of the crew on one vessel hearing anything but its own signal. The failure of vessels, in foggy weather, to hear each other's signals is recognized as a common occurrence in collision cases. The Pennsylvania, supra; The Niagara (D.C.N.Y. 1896) 77 F. 329; The Patria (D.C.N.Y. 1899) 92 F. 411; The Columbia (D.C.Cal. 1900) 104 F. 105. "Sound in a fog is full of curious caprices." The Youngstown (C.C.A.2, 1930) 40 F.(2d) 420, at page 422. · The contention that the crew of the Arbutus may not have heard the signals because of the noise of her engine lacks substance. The pilothouse is a combination pilothouse and salon. It was used on each voyage as a sitting room. There is a piano in it. And cards were played in it without any interference by the rumble of the engine. Upon this voyage, one of the libelants, Mrs. Edwards, occupied a chair in it during, practically, the entire voyage. It is doubtful that she would have resorted to it as a refuge if, as claimed, the sound of the engine was so great as to interfere with ordinary conversation or that persons would engage in the sociable game of bridge if there were difficulty in hearing one another's voices.

So there is no fault in the Arbutus in failing to give proper fog signals.

■ However, there is statutory fault in this respect also by the Catalina, in that the blasts blown by her were of short duration, not longer than two seconds, in violation of article 15 of the International Rules of Navigation. This is denied by the crew, but is established conclusively through timing by the naval officer who was a passenger on the Catalina. He and his wife had taken the trip for pleasure—a kind of "postman's holiday." His attention was attracted by the heavy fog and by the fact that the blasts seemed rather short for fog signals. So he timed them on his wrist watch. And, while

it is true that the watch was an ordinary watch and not a chronometer, his testimony is clear as to the facts and to the motives which led him to time the signals. It may be conceded that it might be difficult for an ordinary person to time blasts correctly. However, here was a man who, by the very nature of his profession, was familiar with the international rules of navigation. He was used to hearing fog signals. He. timed them because they seemed too short. The timing confirmed his first impression that they were shorter than required by the International Rules. Testimony of this character by one who is entirely disinterested has the greatest persuasive value. It warrants, in my opinion, the conclusion that the Catalina did not blow proper fog signals. · These faults, and especially the excessive speed, were the direct and sole cause of the collision.

This conclusion is determinative of the controversy.

■ However, under the issues as framed, we must consider whether the Arbutus was in fault. This for the purpose of determining whether the situation calls for the application of the doctrine of mutual fault and a division of the damage. The North Star (1882) 106 U. S. 17, 1 S.Ct. 41, 27 L.Ed. 91; The Chattahoochee (1899) 173 U.S. 540, 19 S.Ct. 491, 43 L.Ed. 801; Aktieselskabet Cuzco v. The Sucarseco (1935) 294 U.S. 394, 55 S.Ct. 467, 79 L.Ed. 942; Puget Sound Navigation Co. v. Nelson (C.C.A.9, 1930) 41 F.(2d) 356. We have already acquitted her of fault as to fog signals.

■ Nor do we think she was in fault in other respects. We consider her speed. Capable of going nine knots an hour at full speed, she was going at not to exceed five and one-half to six knots per hour at the time of the collision.

When the Catalina was sighted, the master of the Arbutus, standing at the helm, had her under full control. The fact that he acted quickly and, by turning the wheel hard right, succeeded in swerving the Arbutus so that she was at the port side of the Catalina and that the Catalina struck her port side practically amidships, thus avoiding the serious personal injuries to all which might have resulted had the Catalina struck the bow of the Arbutus, indicates excellent sea-

manship and judgment under trying circumstances. In fact, the culpable suddenness of the appearance of the Catalina would have excused even faulty navigation upon the part of the Arbutus. The Bellhaven (C.C.A.2, 1934) 72 F.(2d) 206; The Edward E. Loomis (The W. C. Franz), supra (C.C.A.) 86 F.(2d) 705, 1937 A.M.C. 54, at page 57.

The inadequacy of Arbutus' lookout is pressed. We have already indicated that she had a lookout and that he was at his post from the time the Arbutus encountered the fog until the collision, standing on her port side outside the pilothouse, at a distance of approximately 23 feet from her stem. The purported admissions of the deck hand, who acted as lookout, that he was not at his post when the collision occurred, which he denies, lack persuasive value. So many of them were testified to that, if believed, one would have to assume that all the crew of the Arbutus did, after being taken aboard the Catalina, was to engage in a kind of overt general *peccavi*, telling right and left to such members of the crew of the Catalina, including a woman courier, as would listen to them or could overhear them, all the alleged statutory faults of the Arbutus necessary to exonerate the Catalina from liability.

It is insisted strongly that, granting the Arbutus had a lookout, his position was not proper.

The lookout is, as the phrase goes, "both eyes and ears of the ship." And while the requirement for a proper lookout is not statutory, so as to make nonconformance a statutory fault, nevertheless, in each case in which the question arises it must be determined whether such absence was *actually* a contributing fault. The ship will be held in fault if the lookout fails to see or hear what, if he had given heed, he should have seen or heard. The Commonwealth (Booth Fisheries Co. v. Danielson), 36 F.(2d) 581 (C.C.A.9, 1930); Dahlmer v. Bay State Dredging & Contracting Co. (C.C.A.1, 1928) 26 F.(2d) 603, 604; The Cherokee (C.C.A.2, 1930) 45 F.(2d) 150.

The lookout is held to a high degree of care and vigilance. The Ottawa (1865) 3 Wall. 268, 269, 18 L.Ed. 165; The Ariadne (Pentz v. The Ariadne) (1871) 13 Wall. 475, 20 L.Ed. 542; The New York (1899) 175 U.S. 187, 20 S.Ct. 67, 44 L. Ed. 126; The Felix Taussig (C.C.A.9, 1925) 5 F.(2d) 612; The Edward L. Fuller (C.C.A.2, 1925) 4 F.(2d) 999. As said in The Colorado (1875) 91 U.S. 692, 699, 700, 23 L.Ed. 379: "Lookouts are valueless unless they are properly stationed, and vigilantly employed in the performance of their duty; and if they are not, and in consequence of their neglect the approaching vessel is not seen in season to prevent a collision, the fault is properly chargeable to the vessel, and will render her liable unless the other vessel was guilty of violating the rules of navigation. Baker v. City of N. Y. [Fed. Cas. No. 765], 1 Cliff. [75], 84; Whitridge v. Dill, 23 How. [448], 453 [16 L. Ed. 581]; The Catharine [v. Dickinson], 17 How. [170], 177 [15 L.Ed. 233]." And while it is ordinarily stated that he must be posted on the forward deck [The Ottawa, supra; The Tillicum (C.C.A.9, 1916) 230 F. 415; The Choctaw (C.C.A. 6, 1921) 270 F. 114; La Boyteaux, The Rules of the Road at Sea (1920) p. 220], in the "eyes" of the ship, there is no hard and fast rule which requires that he should occupy a particular position in the bow or a definite distance from the stem. The test is whether the additional distance may have prevented him from hearing and locating the signals of the approaching vessel. Thus, a distance of 15 or 20 feet abaft the stem is not a fault. The Caro (D.C.N.Y.1884) 23 F. 734; The Cherokee, supra.

We believe that the position chosen for the lookout on the Arbutus was proper, under the circumstances. The only other places where, it has been suggested, a better lookout might have been stationed, were in a prone position in the bow or standing closer to the stem holding on to the mainstay. We need not concern ourselves with the question whether either would have been comfortable for the lookout or whether this fact may be considered. The few feet difference in distance in so small a vessel *would not have improved* the situation. There is nothing to warrant the inference that a lookout in another position would have seen the oncoming Catalina sooner.

The master of the Arbutus, at the wheel in the pilothouse, sighted the steamer at the same moment as the lookout and

before he received his signal and heard him sing out, "Steamer, dead ahead!"

■ It is true that a lookout should have no other duties which interfere with his proper functions.

The lookout on the Arbutus had no such other duties. The only other act he performed, after being posted, was that of wiping the spray from the window in the pilothouse behind which the master stood. This he did several times during the voyage. And the evidence is uncontradicted that the last time was at least fifteen minutes before the collision. But once did he go below. This was long before the collision—in fact, just as the Arbutus was leaving the breakwater.

■ So, on the whole, we are brought to the proposition that even if a lookout is improperly stationed or engaged in other duties or even entirely absent, it is not a fault where the other vessel was seen or reported as soon as possible and a proper lookout would not have availed to prevent the collision. The Nacoochee, supra; The Chattahoochee, supra; The Blue Jacket v. Tacoma Mill Co. (1892) 144 U.S. 371, 12 S.Ct. 711, 36 L.Ed. 469; The Georg Dumois (C.C.A.4, 1907) 153 F. 833; The Columbia (D.C.Cal.1900) 104 F. 105; Otto Marmet Coal & Mining Co. v. Fieger-Austin Dredging Co. (C.C.A.6, 1919) 259 F. 435; Penn. R. R. Co. v. Steamtugs Downer IX, and Mary E. Meseck (D.C.N.Y.1935) 1935 A.M.C. 1358; The Wyomissing (C.C.A.3, 1934) 72 F. (2d) 834.

■ Admissions by the crew, other than the master, were received for the purpose of impeachment only. Evidence was also received of admissions by the master made both immediately after and long after the accident. Such admissions are received in admiralty for the purpose of charging the ship or her owners. This upon the ground that the master represents the owner and was his agent in navigating the vessel at the time of the collision. See The Enterprise (D.C.Mass. 1870) 8 Fed.Cas. p. 731, No. 4,498; The Potomac (1870) 8 Wall. (75 U.S.) 590, 19 L.Ed. 511; The S. S. Wilhelm (C.C. A.6, 1893) 59 F. 169, 172; The Lisbonense (C.C.A.2, 1892) 53 F. 293, 301; Frederick Leyland Co. v. Hornblower (C.C.A. 1, 1919) 256 F. 289, 296; The W. Talbot Dodge (D.C.N.Y.1926) 15 F.(2d) 459, 460; The Kaga Maru (D.C.Wash.1927) 18 F.(2d) 295, 296.

■ In arriving at the decision, in this case, the admissions of the master, *whenever made,* have been given the full scope to which they are entitled under these authorities.

They and the other admissions, and the failure of the Arbutus to hear the whistle, do, at best, but raise a doubt as to the management of the Arbutus at, or about, the time of the collision.

We are firmly of opinion that the faults of the Catalina—the major one, excessive speed, *established by uncontradicted testimony* and the admissions of her own officers—lay at the bottom of the collision.

Whatever the doubts as to the navigation of the Arbutus, they are insufficient to overcome the announced conclusion that upon the Catalina must fall the sole responsibility for the collision and the injuries and damage consequent upon it. See The City of New York (1893) 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; Otto Marmet Coal & Mining Co. v. Fieger-Austin Dredging Co., supra; Compania de Navegacion Interior v. Boston-Virginia Transp. Co. (C.C.A.5, 1922) 278 F. 868, 869; The Eagle (C.C.A.9, 1923) 289 F. 661; Steffens v. United States (C. C.A.2, 1929) 32 F.(2d) 206; The Priscilla (C.C.A.1, 1932) 55 F.(2d) 32; Pacific Spruce Corp. v. City and County of San Francisco (C.C.A.9, 1934) 72 F.(2d) 712.

The libelants are, therefore, entitled to recover their losses and damages caused by the culpable collision.

The determination of the amount requires no extended discussion.

■ The object of damages in admiralty is to make the libelant whole, under the doctrine of restitutio in integrum. If repair of the vessel is practicable, the libelant is entitled to recover the cost of such repairs as would restore her to her former condition. Costs of survey, towing to dry dock, dry-docking, the wages of the crew while the vessel is lying idle, and the like, are also allowed, whether the vessel is ultimately repaired or not. See The Baltimore (1869) 8 Wall. 377, 19 L.Ed. 463; Louisville & Cincinnati Packet Co. v. United Coal Co. (C.C.A. 6, 1915) 223 F. 300; Compania de Nave-

gacion Interior v. Boston-Virginia Transp. Co. (C.C.A.5, 1922) 278 F. 868, 869; Pan-American Petroleum & Transport. Co. v. United States (C.C.A.2, 1928) 27 F.(2d) 684; The West Arrow (C.C.A.2, 1936) 80 F.(2d) 853; The Bulgaria (D.C.N.Y. 1897) 83 F. 312; The Texas (D.C.N.Y. 1928) 27 F.(2d) 162; The B. F. Guinan (D.C.N.Y.1930) 40 F.(2d) 277; The Super X (D.C.N.Y.1936) 15 F.Supp. 294. If the vessel is a total loss, the libelant is entitled to its market value at the time of the collision. See The Baltimore, supra; Alaska S. S. Co. v. Inland Nav. Co. (C.C.A.9, 1914) 211 F. 840.

Under these principles, the damages are assessed as follows:

Libelant Leroy M. Edwards is awarded the following sums: The market value of the yacht, which the court fixes at $22,000; the cost of salvage, $2,000; the cost of the watchman, $34; the master's salary, $150; temporary salvage service, $215.01; storage $400; survey fees, $375.24; or a gross total of $25,174.26, less the amount received from the sale of the wreck, $2,100, making a net total of $23,074.26. Also the sum of $1,366.66 for loss of personal effects.

Libelant Lillian M. Edwards is awarded the sum of $608 for loss of personal effects.

Libelant E. C. Moore is awarded $182.66 for loss of personal effects.

Libelant May H. Leeds is awarded the sum of $212.32 for loss of personal effects.

Libelant William Zorn is awarded the sum of $100 for personal injuries suffered, $35 for loss of wages, and $55.54 for loss of personal effects.

Libelant Walter R. Leeds is awarded the sum of $10,750 as damages for personal injuries and the sum of $176.67 for loss of personal effects.

All the above items, except the items awarded for personal injuries to libelants Zorn and Leeds, and the expenses incurred on the yacht by libelant Leroy M. Edwards, shall carry the California legal rate of interest, 7 per cent., from the date of the collision, April 10, 1936. The awards for personal injuries shall carry no interest, and the items of expenses incurred on the yacht shall carry interest from date of payment only.

Decree and findings accordingly.