GRACE LINE, INC., as Owner of THE S.S. SANTA MARGARITA, Libelant,

v.

UNITED STATES LINES COMPANY and THE S.S. AMERICAN MANUFAC-TURER, her engines, boilers, etc., Respondent-Claimant,

THE Tug JOSEPH H. MORAN, INC., and THE Tug CAROL MORAN, her engines, boilers, etc., Respondent-Claimant,

v.

MORAN TOWING & TRANSPORTATION CO., Inc., Respondent.

United States District Court
S. D. New York.
April 26, 1961.

Hill, Betts, Yamaoka, Freehill & Longcope, New York City (David C. Wood and Eli Ellis, New York City, of counsel), for libelant.

Kirlin, Campbell & Keating, New York City (John F. Gerity, New York City, and Donn Borg, New York City, of counsel), for respondent United States Lines.

Burlingham, Hupper & Kennedy, New York City (Eugene Underwood and Kenneth H. Volk, New York City, of counsel), for respondents Moran.

FRIENDLY, Circuit Judge.

By this libel Grace Line, Inc. seeks to recover damages of $45,000 allegedly sustained by its vessel, the Santa Margarita, when another Grace Line Ship, the Santa Rosa, allegedly through the fault of United States Lines Company (hereafter "Respondent") and Moran Towing and Transportation Co., Inc. (hereafter "Moran"), caused a Moran tug, which was assisting in undocking the Santa Rosa, to be forced against the Santa Margarita at the latter's berth. The case differs from the usual collision case in that the only vessel seriously claimed to be at fault was never in contact with the alleged victim. It differs also in the number of defenses asserted by the respondents who, in addition to the usual course of challenging libelant's version of the facts, denying fault of their own and alleging it on the part of libelant, assert that no damage was in fact sustained by the Santa Margarita, claiming that the asserted injuries to her plating had been suffered long before or, in the alternative, were sustained in a second unsuccessful undocking maneuver by the Santa Rosa, for which respondents concededly had no responsibility. The case conforms to the norm in the sharp conflict of evidence as to what occurred. It has not been necessary to pass on all the issues tendered for I find libelant has not sustained its burden of showing that either respondent was at fault.

It will be convenient first to set forth the facts on which the parties are agreed, next to discuss their factual disagreements, and finally to consider libelant's various specifications of fault.

## I.  The Agreed Facts

On the early afternoon of March 9, 1956, the Grace Line passenger vessel, S. S. Santa Rosa, lay berthed, bow in, at the north side of Pier 57 on the New York shore of the Hudson, preparing to leave her slip under the direction of a Moran pilot and with the assistance of the tug Carol Moran. There was an ebb tide of 2 knots; the wind was from the southwest at a force of 25 miles per hour, more or less. The S. S. American Manufacturer, a C-2 passenger and freighter combination vessel, owned by respondent United States Lines, passed Pier 57 about 1300, moving slowly upriver with the tug Susan Moran at her starboard bow. She too was under the control of a Moran docking pilot. As the Manufacturer approached, Grace shore personnel at the end of the pier displayed a red flag to warn the Santa Rosa that the river was not clear. At some time thereafter and before the Manufacturer came to rest in her destined berth at the south side of Pier 59, they replaced the red flag with

a white one indicating that the Rosa might safely undock. Casting off her remaining lines, she sounded one long blast on her steam whistle to signify her intention to leave her berth. Her twin engines were put full astern, three short blasts were given to indicate this, and she began to back from her slip into the river. The American Manufacturer, lying somewhere between Piers 57 and 59, had been maneuvering her engines alternately ahead and astern while awaiting the clearing of small craft from her slip and the arrival of a second tug to aid her in docking. She did not whistle in reply. Within one or two minutes after the Santa Rosa began to run astern, both the third mate on her stern and the Grace personnel at the pier end decided that her course was endangered by the Manufacturer. The Rosa sounded a danger signal, which was not answered, and then put back into her slip to avoid possible collision. In reentering the slip she drifted toward a second Grace vessel, the S. S. Santa Margarita, also a C-2, which was moored just north of her at the south side of Pier 58. In order to keep the two Grace vessels apart, the tug Carol Moran was ordered between them. Still drifting, the Santa Rosa forced the tug against the side of the Santa Margarita.

## II. The Disputed Facts Concerning the Movements of the Manufacturer

A. *Libelant's Version.* The American Manufacturer continued upriver until her stern had passed beyond Pier 58. She began to angle in toward Pier 59 and was assisted by a second tug on her starboard quarter, continuing in toward her berth for two or three minutes. The warning red flag at the end of Pier 57 was lifted and the go-ahead white one displayed at 1309. By this time the Manufacturer's bow had entered her slip and was more than sixty feet in from the river end of Pier 59. Three diagrams made by libelant's witnesses show the Manufacturer as having turned so as to be heading more toward her berth than up the river—at an angle, that is, of more than 45 degrees to the center line of the river.

The lines were cast off on the posting of the white flag; this took two minutes, or until 1311 by the Rosa's clock. The river was then clear. Sounding her whistle, the Rosa began to move astern. Then, after the Rosa got underway, the Manufacturer began to back down the river; the red flag was again displayed, the danger signal was given, and the Rosa ducked back into the slip. The Manufacturer kept coming down river, perhaps 100–200 feet off the pier ends, until she completely blocked exit from the Rosa's slip, her stern well below Pier 57. Then she made a second approach and gained her berth at Pier 59.

B. *Respondents' Version.* The Manufacturer proceeded upriver until her foredeck was laterally off her own slip on the south side of Pier 59. From 1303 to 1305 she ran her engine full astern, to take headway off the vessel and bring her to a complete halt. Then, after a moment without power, she put her engine on slow ahead to hold her position against the tide, from 1306 to 1309. At 1310 the tug Alice Moran came to her starboard quarter, and the Manufacturer ran her engine full astern for two minutes. This action, respondent claims, did not cause the vessel to move astern or even permit the current to carry her downriver; because of the counterclockwise turning of the propeller and the Manufacturer's deep stern draft, its effect was rather to carry the stern toward port. At 1312 the engine was stopped and then run ahead, and the Alice Moran had begun to push the stern to port. Only after this was the Santa Rosa heard to blow her whistle preparatory to leaving her slip. At this time the stern of the Manufacturer was still overlapping the slip between piers 57 and 58, although by then the vessel lay at an angle with her bow nearer to shore. From then on the Manufacturer proceeded directly into her berth with no backing whatever; at all times prior to 1312, when she began to move forward and the Rosa's whistle first sounded, the Manufacturer blocked a safe exit from the north side of Pier 57.

C. *Summary*. Libelant's version thus is that the Manufacturer had passed quite beyond the slip between Piers 57 and 58 and had angled more than 45 degrees toward the shore when the Rosa began to move astern, only to come back down the river after hearing the Rosa's whistle. Respondents, on the other hand, maintain that although the Manufacturer had begun to turn her stern away from shore by the time the Rosa sounded her whistle, she had never progressed so far north as to clear the slip; that the Manufacturer was thus in plain view, almost behind the Rosa, when the white flag was shown by what respondent claims the gross fault of a shore employee inexperienced in this work; and that, although the Manufacturer's engine was run full astern for turning purposes until just before the Rosa's whistle was sounded, the Manufacturer never moved astern but began to move upriver on her final approach just before the signal. Thus sharp fact issues are presented as to the position of the Manufacturer when the Rosa's whistle blew and as to whether she moved or drifted downriver thereafter.

D. *The Evidence*. The evidence as to the Manufacturer's movements is of two principal kinds: logs and bell books from the three vessels for March 9, 1956, and depositions or trial testimony taken more than four years later. There are in addition a few statements made by certain Grace Line personnel immediately following the incident, which are in accord with their later testimony.

1. *The ship records*. For present purposes the sole important entry in the Santa Margarita's log is that at about 1320 she was struck by the Carol Moran.

The engine logs of the Santa Rosa are uninformative. Relevant entries in her deck log are as follows:

"1309  Let go aft
1311  All clear aft  White flag  Full astern
1312  Red flag on dock  U. S. Lines Freighter, stern headed down

river Close to piers blocks us from river.  Full ahead."

These engine maneuvers are confirmed by the deck bell book, an extract from which was received in evidence over Respondent's objection, the original having been lost. The engine bell book also reports full astern at 1311 but tells us that full ahead was not ordered until 1313, a full two minutes after the astern order was received rather than one.

The rough and smooth engine logs of the American Manufacturer are of no assistance. But the deck bell book, which served as a rough log as well, reports:

"1244  Dock/Master Buck abd.
1300  Vessel arrived off Pier #59
1312  Tug Alice M Moran fast s/s aft
1317  Vessel entering berth
1318  1st line ashore"

The Manufacturer's engine operations are recorded as given and as received in the deck and engine bell books:

| "Deck | Engine | |
|-------|--------|--------|
| 1249 | 1253.5 | Full ahead |
| 1300 | 1300 | Stop |
| 1303 | 1303 | Full astern |
| 1305 | 1304.5 | Stop |
| 1306 | 1306.5 | Slow ahead |
| 1309 | 1309 | Stop |
| 1310 | 1309.5 | Full astern |
| 1312 | 1311.5 | Stop |
| * | 1312 | Full ahead |
| 1314 | 1312.5 | Full ahead |
| 1315 | 1313.5 | Stop |
| 1316 | 1315 | Slow ahead |
| 1317 | 1317.5 | Half ahead |
| 1318 | 1318 | Slow ahead |
| 1318.5 | 1318.5 | Stop" |

It is quite impossible to reconcile these entries, even *ignoring cases where one or the other must be in error*. The time entry in the deck bell book sometimes is earlier, sometimes later and sometimes the same as that in the engine book. There is equally no way of knowing whether the clocks on the Santa Rosa and the Manufacturer were synchronized and, if not, what the difference was. This is

---

* The Dock bell book entry here appears to be 1317, Half ahead; this seems to be an error.

one of the difficulties in the way of ascertaining just what occurred.

2. *The testimony.* Libelant offered in support of its version of the accident the testimony of six witnesses, all presently employed by or retired from Grace Line.

a. *Frank S. Siwik,* Acting Port Captain for Grace on March 9, 1956, who was stationed at the end of Pier 57 supervising the departure of the Santa Rosa. He had recently assumed the duties of the regular Port Captain, who had gone on vacation; this was the first departure he had superintended from a pier, although he had extensive experience as a master. He testified that he saw the Manufacturer pass Pier 57 with a single tug aiding her heading somewhat inshore toward Pier 59. A second tug came to the Manufacturer's assistance. About two minutes later the United States Lines vessel had turned almost parallel to the piers, with her bow below Pier 59 and her stern above Pier 58. Her bow had entered her berth. At this point he ordered the white flag raised. For two to three minutes he looked away, watching the taking in of the stern lines. When he next looked he saw the Manufacturer coming astern down the river, her stern falling inshore, until her bow was at or below the northern side of Pier 57.

b. *William Knollman,* Assistant Port Captain for Grace, who was also at the end of Pier 57. His testimony is substantially the same as Siwik's: The Manufacturer proceeded upriver about 400–500 feet off the pier ends until she was beyond Pier 58 and angled in until her bow disappeared behind the shed of that pier, over sixty feet from the river end. After the Santa Rosa began to move, the other ship's wake showed that her engine was going astern, and she backed down almost parallel to the pier ends until her bow was midway between piers 57 and 58.

c. *John Thomas Russell,* Third Officer of the Santa Rosa, who was on the stern of that vessel. His testimony is almost identical with that of Siwik and Knollman. The Manufacturer passed upriver until she was off Pier 59 and heading into her berth. At this point the white flag was raised and Russell, as the ship's officer in the best position to observe the condition of the river, signalled that all was clear. After the Rosa started out of her slip, the Manufacturer began to come astern downriver, until finally she blocked the exit entirely some 300–400 feet beyond the pier ends.

d. *Alf Adler,* Master of the Santa Rosa. On the bridge of his vessel, he saw the Manufacturer pass altogether out of sight beyond Pier 58. At 1309 the white flag was given, and the river was clear from his position; it was still clear at 1311 when full astern was ordered. After one or two minutes he saw the Manufacturer's stern appear, and she kept coming until she blocked exit from the slip.

e. *Harold Andreason,* Chief Mate of the Santa Rosa. He, too, was on the bridge. He saw the Manufacturer pass upriver about 1300, some 300–400 feet off the pier ends, and disappear from view beyond Pier 58. He was not altogether clear as to whether he had an unobstructed view of the river when the white flag was raised, but he did see the red flag go up after the Rosa had been in motion, and then he saw the stern of the respondent's vessel come downriver until the slip was blocked and the midship section of the Manufacturer was in view.

f. *Howard Ford,* Master of the Santa Margarita. He came out on the bridge of his vessel when he heard the Santa Rosa whistle preparatory to leaving her berth. He saw nothing in the river aft until after the Santa Rosa had started back into her berth; then the Manufacturer came into view stern first.

Seven witnesses for the respondents testified to the contrary:

a. *Rear Admiral Richard O. Patterson,* Master of the American Manufacturer who was on her bridge. He denied that the Manufacturer ever backed downriver. When her engine was stopped at 1300, her bow had just reached the south side of Pier 57, and she was parallel to the pier ends, some 300 feet from them.

After running the engine full astern for two minutes, she came to a halt by 1305 with her bow midway between Piers 58 and 59 and her stern midway between 57 and 58, still parallel to the pier ends. Her engine was run ahead to maintain this position against the tide. At 1310, with the Susan Moran holding her bow, her engine was put full astern for another two minutes, which had the effect of moving her stern to port. At 1311 the Alice began to aid this maneuver by pushing from the starboard quarter, and she made fast to the Manufacturer at 1312. At 1312 the stern was still midway between Piers 57 and 58, but the ship was now at an angle perhaps 30 degrees away from the upriver axis. Still moored at 1312, the Santa Rosa blew her whistle and then began to move astern. After 1313 the Manufacturer's movement was ahead into her berth.

b. *Harlan L. Wadleigh,* Chief Officer of the Manufacturer. He, too, was on the bridge; his testimony is the same as that of Admiral Patterson. At 1305 the bridge was abeam of Pier 58, the bow was at the south edge of Pier 59, the stern was below Pier 58, and the ship was parallel to the pier ends. When the second tug arrived at 1312, the vessel was in the same position. During this period her stern was never more than 100 feet below Pier 58 nor her bow above the center of Pier 59; her position ranged perhaps fifty to seventy-five feet up and downriver. The Santa Rosa was still moored at 1312; then she blew her whistle and began to back out into the river. By that time the Manufacturer had begun to proceed upriver in the single movement which carried her into her slip.

c. *Lee Thomas Lautenschlager,* Second Mate of the Manufacturer, now in the grain business. He was stationed on the bow. He testified that the bow of the Manufacturer reached the south end of Pier 59 and perhaps went as far north as the center of the pier; that when the second tug arrived the bow was canting in toward the piers; and that after that time the ship proceeded right into her berth in a continuous movement.

d. *Lloyd David Lowell,* Third Mate of the Manufacturer. About 1300 (he was not keeping the time) the Manufacturer arrived off her berth and lay parallel to the pier ends, some 400 feet off, her bow between Piers 58 and 59 and her stern about the center of the slip below, waiting for barges to be cleared from the north side of Pier 58 and for the Alice Moran to come to her stern. Her stern never proceeded above Pier 58 nor fell below 57, although there was some range up and down the river, perhaps fifty feet. Lowell could see clearly into the open water between the Rosa and the Margarita. After the stern tug had pushed the Manufacturer's stern perhaps twenty feet into the channel, and the ship had started forward toward her berth, the Rosa whistled and started astern. After this the Manufacturer never went downriver.

e. *John P. Halligan, Jr.,* Junior third mate of the American Manufacturer. He too denied that the vessel had reached the position asserted by Grace or backed downriver. Both at 1303 and at 1309 her stem was at the south edge of Pier 59, not more than 5 degrees away from parallel to the pier ends. She moved no more than a few feet up or down. At 1312, when the Rosa started to move, the Manufacturer's bridge was abeam the center of Pier 58 and the vessel lay at an angle of 22½ to 30 degrees. Halligan was on the bridge.

f. *Kenneth A. Buck,* docking pilot for the Manufacturer, employed by Moran. He was on the bridge. The ship came to a stop at 1305, parallel to the pier ends and about 300 feet off, with her bridge abeam Pier 58 and her stern below. She was still there at 1309. The Rosa did not begin to move until after 1312, and by that time the Manufacturer was probably making her approach and passing Pier 58.

g. *James Cummings,* deck mate of the Alice Moran. The Alice came alongside the Manufacturer at 1310. At that point the Manufacturer was parallel to the pier ends, with her stern below Pier 58. When the Grace Line ship then started astern, he remarked "Grace must be in a hurry." The Alice pushed the Manufac-

turer's stern toward port, and the latter proceeded on into her berth. He denied the Grace Line version.

Siwik, Knollman, Adler and Ford for libelant and Lautenschlager, Buck and Cummings for respondents testified at the trial; the testimony of the other witnesses mentioned was given by deposition. The Court has no criticism of the demeanor of any of the witnesses who testified at the trial; however, I was particularly impressed by the testimony of Captain Buck.

### III. The Findings of Fact

██ So sharp a conflict of testimony from witnesses apparently sincere but whose reconstruction of the accident was inevitably colored by their interest even when the event was fresh, and whose memory has hardened as time has passed, necessarily brings into play the rule of judicial administration that

> "The burden of proof rests upon the libelants, whose duty it is to establish by a preponderance of evidence the facts upon which the right to recover rests."

Guinan v. Boston, Cape Cod & N. Y. Canal Co., 2 Cir., 1924, 1 F.2d 239, 245; Commercial Molasses Corp. v. New York Tank Barge Corp., 1941, 314 U.S. 104, 112, 62 S.Ct. 156, 86 L.Ed. 89. The Court must analyze the evidence to see whether either side's oral testimony conflicts with contemporaneous records, incomparably more valuable in such a case, or is inherently improbable. Unless it so finds, it must cast the die against the party on whom the burden falls.

In seeking to meet its burden, libelant first seizes on the entry in the Manufacturer's log that at 1300 "Vessel arrived off Pier #59." When the engine was stopped at 1300, it had been running full ahead for seven to eleven minutes; hence, if the vessel lay off the end of Pier 59 at 1300, her headway must necessarily have carried her a not inconsiderable distance beyond that pier before coming to a halt. This would be in line with libelant's version as to her disappearance from view upriver and also would make it necessary for her to back down the river before entering her berth. But it would be wholly inconsistent with libelant's evidence that she lay with her bow well into her slip. Moreover, the log entry should not be taken so literally. Admiral Patterson and Captain Buck both testified that the Manufacturer did not reach Pier 59 until 1305; Patterson placed the vessel just at the south edge of Pier 57 when her engine was stopped at 1300. This seems near enough to the berth to explain the cryptic log entry; when a vessel stops her engines within coasting distance of her slip, one may well say she has arrived "off" her berth.

Libelant then turns to the fact, revealed in the Manufacturer's log and not disputed, that the engine was run full astern for two minutes following 1310. The landlubber would suppose that when the engine of a ship, which must have been stopped or nearly so, is run full speed astern for two full minutes in a two-knot ebb tide against her bow, she would tend to move astern. Libelant's proctor strove, repeatedly but unsuccessfully, to elicit this from respondents' witnesses. Under close examination, Captain Buck, Admiral Patterson and Third Mate Lowell all insisted the primary effect of the full astern engine during the first few moments, under the circumstances here, was to throw the stern to port; when sternway is desired, slower propeller is used. Libelant's witnesses did not deny that the maneuver had a tendency to cast the stern to port, and respondents' theory is borne out by independent authority. The vessel's single screw turns counterclockwise when running astern. Thus, according to Knight's Modern Seamanship (10th ed.), pp. 490–91, "the sidewise pressure of the propeller * * * will at all times be to port." Moreover, the "discharge screw current," the water thrown clear of the rotating propeller, is cast high against the starboard side of the hull, with only a small counter effect against the port side, because of the shape of the hull. The net result of these and other forces is that "the stern will probably swing to port." This does not prove

that the ship does not also move astern, especially in a two-knot ebb tide; but it does show that sternway may not be the major consequence. Further, there were other forces working on the vessel; the Susan Moran was fast to her starboard bow, and Admiral Patterson believed the tug might have been holding the bow against the downriver pull. Finally, it is not established that the Manufacturer was quite stationary when the astern order was given; her engine had run slow ahead from 1306 to 1309, hence she probably had some headway that had to be overcome before she could move downriver. Thus the evidence is insufficient to establish that the Manufacturer moved downriver to a substantial extent, even assuming, most favorably to libelant, that this period or any resulting sternway occurred after the Santa Rosa had begun to move.

There is a certain degree of improbability in the precise versions of both sides. For responsible men, experienced in the life of the sea, to back a large passenger vessel out of her slip, when another ship lies within one hundred feet or less upstream of her intended path, in a strong ebb tide, seems quite unlikely, even if the man in authority was new at the particular job. On the other hand, Admiral Patterson testified that such audacious haste is not uncommon:

"A. I thought he was trying to blow his signals just to scare us out of his way.

"Q. Is that often done?

"A. Very often, I am sorry to say."

The Santa Rosa was overdue to depart. Noon was her usual sailing time, and her lines had been singled up for several minutes before 1311; she was ready to go.

Moreover it appears equally unlikely that the Manufacturer, handled by highly experienced men, would deliberately back downstream into the Santa Rosa's path, after hearing her whistle and seeing her move or, indeed, that if the Manufacturer had in fact attained the position claimed by the Grace witnesses, the vessel should have done anything other than enter her berth.

The situation seems the not uncommon one where both sides have overstated their case. The events in suit occurred over four years before any testimony was taken; without suggesting conscious dishonesty, the memory of an interested witness is likely to be self-serving at the outset and to sharpen over the years in the sense favorable to his cause, see Morgan, Hearsay and Preserved Memory, 40 Harv.L.Rev. 712, 717, fn. 2 (1927). Very likely, when the white flag was raised, the Manufacturer was further north than respondents' employees recalled, yet not so far toward her berth as Grace's employees recalled. Very likely the two minutes of full astern, ordered before the white flag was raised and the Rosa's whistle was blown, produced some sternway thereafter, somewhat more than respondents' witnesses recalled, much less than Grace's and this became apparent after the Santa Rosa's movement began. Very likely again, what happened was that the Grace employees, who had first been unduly optimistic about the Manufacturer's northward progress, became unduly apprehensive about her southward. Siwik's looking away from the river for two to three minutes and Knollman's seeing the foam of the Manufacturer's propellers may be quite significant here. At least the Court is not persuaded that the facts were any more favorable to libelant than this.[1]

---

1. Libelant requests the Court to draw an inference adverse to respondents from their failure to call Captain Evans, Moran undocking pilot aboard the Santa Rosa, a Mr. J. Meseck of Moran, whom Captain Siwik testified was on the end of Pier 57 with him, and the United States Lines employees on Pier 59. Assuming in libelant's favor that these witnesses are available to respondents, but also that they were available to subpoena by libelant, the Court has given such weight to this as it considers appropriate. Similarly, the Court has given appropriate weight, as requested by Respondent, to libelant's failure to take a contemporaneous statement from Russell, the third officer of the Santa Rosa, who was on the stern.

## IV. The Alleged Fault of United States Lines

I shall now review the specifications of fault against United States Lines in the libel:

**A.** *The claim that "the American Manufacturer was not in charge of competent persons."* (Item 1). There is no support for this in the record; the undisputed testimony is that the docking pilot and master were among "the best in the business," and there is nothing to cast the slightest doubt on the ability of her other officers.

**B.** *The claim that "the American Manufacturer failed to maintain a proper lookout."* (Item 2). Although the Inland Rules do not explicitly require the posting of a lookout, Article 29 states that "Nothing in these rules shall exonerate any vessel * * * from the consequences * * * of any neglect to keep a proper lookout * * *." 33 U.S.C.A. § 221. The duty exists as a matter of elementary prudence, see Gilmore & Black, Admiralty (1957), pp. 420–21; Griffin on Collision (1949), pp. 262–63; it cannot ordinarily be fulfilled by a person whose other duties are such that he cannot devote his undivided attention to possible obstructions or dangers. Chamberlain v. Ward, 1859, 21 How. 548, 571, 62 U.S. 548, 571, 16 L.Ed. 211; Circle Line Sightseeing Yachts, Inc. v. City of New York, 2 Cir., 1960, 283 F.2d 811, 814. And although the duty to provide a lookout is not statutory, one in breach of it must shoulder the burden of The Pennsylvania, 1873, 19 Wall. 125, 136, 86 U.S. 125, 136, 22 L.Ed. 148, in order to avoid liability; he must prove that the breach not only was not but "could not have been" a contributing cause of the accident. Circle Line Sightseeing Yachts, Inc. v. City of New York, supra, 283 F.2d at page 815; The Madison, 2 Cir., 1918, 250 F. 850, 852. Although in applying the rule a court ought not indulge in "speculation and conjecture", Griffin, supra, at p. 473; The Suffolk, 2 Cir., 1919, 258 F. 219, the standard is clearly more strict than would obtain at common law.

It is not contended that the American Manufacturer had no lookout at all; the few references to this claim in libelant's brief suggest rather inadequate observation from the stern. A backing vessel, or one which is drifting astern with the tide, is required to have a stern lookout, Nassau Barge Corp. v. The Fred B. Dalzell, 2 Cir., 1950, 180 F.2d 560, 561; The Senator D. C. Chase, 2 Cir., 1901, 108 F. 110, but the Court of Appeals has held that a stationary vessel waiting to move forward into her slip need not have one, Nassau Barge Corp. v. The Fred B. Dalzell, supra. Since libelant has not established that the American Manufacturer was going astern either under her own power or with the ebb tide when the Santa Rosa began to back into the river, the issue might perhaps be disposed of on this ground. However, under all the circumstances, I do not decide that no stern lookout was required during ahead-and-astern engine maneuvering in the crowded New York harbor. See Griffin, supra, at p. 276.

On the other hand, the evidence does not show the Manufacturer's stern lookout to have been inadequate at the material time. Third Mate Lowell, on the stern in charge of five men during the entire period after 1245, was in direct communication with the bridge through a telephone headset. Lowell testified that in effect he was the stern lookout; he was "watching up and down the river for any traffic that may hinder our docking operations." True, this was not Lowell's sole function on the stern; he also seems to have been in charge of taking the Alice Moran's line aboard, and during the tug's approach his attention was directed toward her rather than toward the harbor. His men were also preparing the lines to be put ashore and the propeller guards which were to be put over the side after mooring. Thus, Lowell was not a lookout "with no other duties," Circle Line Sightseeing Yachts, Inc. v. City of New York, supra [283 F.2d 815]. However, libelant does not contend the Rosa began to leave her berth before the Alice made fast; even if Lowell's inattention to the

shore during this operation might have rendered the Manufacturer liable for any accident thereby occurring, it did not render his later observation of the Rosa inadequate. This case is a far cry from Circle Line, where the only person watching at all was the captain, who was navigating the moving vessel. Here, the vessel was substantially stationary; Lowell kept his eyes on the Santa Rosa as she whistled and moved astern, and he reported her whistles to the bridge.

■■ Libelant contends that if Lowell had been engaged solely in performing his lookout function, he might have seen the Santa Rosa's stern line coming in two minutes before she whistled, and that his reporting this event might have enabled the Manufacturer to take some action to avoid the danger. The lookout is required not only to observe but also to report his observations, The Madison, 2 Cir., 1918, 250 F. 850, 852. However, the taking in of the Rosa's stern line was not such a significant event as to require reporting to the bridge; the Manufacturer was entitled to assume the Rosa would wait until a clear passage was available before emerging. The Rosa had not yet signalled her intention to leave the berth; it is this signal, and not the taking in of lines, which is calculated to inform passing vessels of an impending change of position. It would not have been negligence for a lookout to have failed to report this innocuous development to the bridge; it was not negligence here even if Lowell did not observe it.

■ Libelant also urges that Lowell failed to report the Santa Rosa's movement to the bridge, and that in this he failed to discharge properly the duties of a lookout. However, there is no evidence to support such a finding. Although Lowell could not recall whether he had notified the bridge, Chief Officer Wadleigh had a clear recollection that Lowell had reported the Rosa's movement. Moreover, the proof is convincing that if he did fail to report, which has not been proved, the failure would not have been a contributing cause of the accident. Admiral Patterson heard the whistles.

Wadleigh, after observing the Santa Rosa's engines turning astern, so informed the Master and Captain Buck, "but they, in turn, could see as well as myself, so it was in one sense unnecessary for me to tell them." Buck reported that Patterson had said to him of the Santa Rosa, " 'I wonder where the hell that guy is going * * * ' and then, of course, I agreed with him. I wondered where the hell the guy was going." Thus it is clear that the officers on the bridge were as fully informed of the Santa Rosa's whistles and astern movement as the most adequate stern lookout could have made them, and therefore liability cannot be predicated on any claimed inadequacy of Lowell's observation or reporting from the stern. The Farragut, 1870, 10 Wall. 334, 77 U.S. 334; The M. J. Rudolph, 2 Cir., 1923, 292 F. 740, 744; The Wyomissing, 3 Cir., 1934, 72 F.2d 834, 836; Panama Transport Co. v. The Maravi, 2 Cir., 1948, 165 F.2d 719. See Gilmore & Black, Admiralty (1957), p. 404.

C. *The claim that "the American Manufacturer did not by proper signals indicate her intention to go astern."* (Item 3). Article 28 of the Inland Rules requires:

> "When vessels are in sight of one another a steam vessel under way whose engines are going at full speed astern shall indicate that fact by three short blasts on the whistle."

33 U.S.C.A. § 213. Libelant argues that this provision imposed a duty on the Manufacturer to whistle when she put her engines full astern at 1310 and that her failure to do so renders her liable for the damages claimed. Respondent denies that a signal is required in favor of a vessel which is moored at the time, asserts the Rule does not apply to a vessel engaged in a docking maneuver, and insists that, even if there was a duty to whistle, its breach cannot have contributed to the accident, since Knollman was aware of the astern engine and a signal could not have apprised him of anything he did not already know. I uphold the

first two contentions and therefore need not decide the third.

■ Libelant's witness, Siwik, admitted that the Rule only applies as to two vessels in sight of each other, both under way. While there is nothing particularly onerous in requiring a whistle signal even when no second moving vessel is visible, the Rule's purpose does not seem to require it. Two vessels under way are a constant danger to one another; a signal is necessary in case of any unusual maneuver so that the second vessel may plot her course accordingly. But a moored vessel has no course; she is herself bound to signal a warning before entering the channel, Art. 18, Rule V, 33 U.S.C.A. § 203. Until this signal is given, vessels under way are entitled to disregard her insofar as the giving of signals is concerned. Griffin, supra, at pp. 198–228. The same Rule V of Article 18 recognizes that a moored vessel is not to be treated as though she were under way: only "immediately after clearing the berths so as to be fully in sight, * * * shall [a departing vessel] be governed by the steering and sailing rules."

. ■ Libelant contends the Santa Rosa was under way before the Manufacturer completed her astern maneuver, citing testimony by Admiral Patterson to that effect. Even assuming, in apparent opposition to the provision of Article 18 just quoted, that Article 28 applies in favor of a vessel which has begun to move but has not cleared her berth—a question I do not decide—libelant has not satisfied its burden of proving the Santa Rosa was under way before the Manufacturer stopped running her engines astern. Admiral Patterson at one point did say so, but his memory on this issue was hazy; he later said it was unclear whether the Santa Rosa had signalled before 1312 or not. There was testimony that she had not, and the doubt cannot be resolved in favor of libelant.

■ Second, libelant's Chief Officer Andreason admitted that the three-blast whistle is not usually sounded by a vessel maneuvering ahead and astern in docking. This practice is sensible, since, as stated by the District Court for the Eastern District of New York, such a signal would be both superfluous and confusing.

"It was not customary for the Pilot to give signals when engines were put in reverse, because the ship, in docking, was being assisted by her engines and it was well known that at times the ship must go ahead, and at other times go astern, and the giving of signals as to the movements of the ship to the tugs, who were assisting, would have caused confusion, as the orders of the Pilot to the tugs were given by whistle." McAllister Bros., Inc. v. The Tuscania, D.C.E.D.N.Y., 1940 A.M.C. 32, 35.

For both these reasons I find no signal under Article 28 was required of the Manufacturer.

■ D. *The four remaining charges of fault, all pertaining to the navigation of the American Manufacturer after the Santa Rosa blew her whistle.* (Items 4–7). The sixth allegation of fault is that "the American Manufacturer responded to the Santa Rosa's danger signal but continued to back across her path." Witnesses for both parties testified that the Manufacturer did not respond to the danger signal. The evidence is insufficient to establish that she backed across the Santa Rosa's path after the whistle; even if I should find that the two minutes of full astern produced substantial sternway, which I do not, libelant has not borne its burden of proving the whistle was sounded before the astern movement of the Manufacturer's engine ended at 1311.5 or 1312.

The three other charges are interwoven. Libelant asserts fault in that the Manufacturer "ignored the whistle signal of the Santa Rosa indicating that she was leaving her berth;" "failed to take any steps to prevent damage to the vessels at Piers 57 and 58;" and "failed to stop and go ahead on her engines when it was, or should have been, apparent that she was placing the Santa Rosa in a position of peril."

The American Manufacturer was engaged in a docking maneuver when the Rosa whistled her intention to leave the berth. She had the right of way; she was entitled to continue her actions and was not required to pause until the Rosa had gone by. On the contrary, the Santa Rosa was under a duty to wait until the river was clear before she undocked. Special consideration should be given to a large vessel maneuvering or approaching her berth. The Fort St. George, 2 Cir., 1928, 27 F.2d 788; The Pavonia, C.C.S.D.N.Y.1885, 26 F. 106, 109–110. Even if I were to assume the Manufacturer was entering her berth when Siwik raised the white flag, which libelant is far from having established, the Santa Rosa was at fault for proceeding; the possible necessity of a second approach by the Manufacturer, under prevailing conditions of wind and tide, should not have been ignored. Still more clearly, if as must be held for these purposes the Manufacturer did not move astern after the Rosa was known to her to have started, Respondent was under no duty to take extraordinary action to move its ship out of the Rosa's way on some reasoning analogous to the theory of the last clear chance. The State of New York, D.C.E.D.N.Y.1869, Fed.Cas.No. 13,327; Griffin, supra, at p. 491. The Manufacturer acted properly in continuing her maneuver, the more so in that her action almost at once after, on her evidence, the Rosa was heard to whistle, was to run her engine ahead. Further, the Alice Moran was at that time pushing her stern to port, away from the approaching Grace vessel.

Finally, I find no force in libelant's assertion that the Manufacturer should have responded to the Rosa's danger signal with one of its own. Blowing the danger signal would have informed libelant of nothing it did not already know. Bouchard Transp. Co. v. Connors Marine Co., 2 Cir., 1942, 129 F.2d 110.

Accordingly, I find and conclude libelant has failed to prove contributory fault on the part of United States Lines and S. S. American Manufacturer.

## V. The Alleged Fault of Moran.

Eleven claims of wrongdoing are alleged against the several Moran entities. Before trial libelant stipulated absence of fault on the part of the undocking pilot of the Santa Rosa, a Moran employee, and at the close of libelant's case I dismissed the libels against the Carol Moran and her owner, Tug Joseph H. Moran, Inc., for lack of proof. Libelant does not press allegations of fault on the part of the Susan Moran or the Alice Moran, and there is no evidentiary support for any such claims. The sole remaining claim is that Captain Buck, pilot of the American Manufacturer and a Moran employee, was responsible for her faults. Since I have held the American Manufacturer to be without fault, this claim also must fail.

The foregoing constitute the Court's findings of fact and conclusions of law.

The libel is dismissed, with costs.